Case 4:10-cv-00757-A   Document 24   Filed 06/15/11   Page 1 of 17   PageID 100

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2011 JUN 15  PM 2:41

CLERK OF COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| MICHAEL C. KING, JR., and DIANA KING, both individually and as Next Friend of MICHAEL C. KING, III, <br> Plaintiffs, <br><br> v. <br><br> ENERGIZER HOLDINGS, INC., <br> Defendant. | § § § § § § § § § § § <br><br> Civil No. 4:10-cv-00757-A <br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Michael C. King, Jr., Dianna King, and Michael C. King, III and file this, their Designation of Expert Witnesses pursuant to Fed. R. Civ. P. 26(a)(2).

Additionally, Plaintiffs designate the experts listed in their responses to Defendants' Interrogatories, Requests for Disclosure and all supplements thereto.

### A. EXPERTS RETAINED TO TESTIFY IN THIS CAUSE

Plaintiffs may call the following individuals to trial, live, by deposition, written affidavit, or by records, who possess sufficient knowledge, skill, experience, training or education to testify in the form of an expert opinion:

1. **James P. Miller, M.D.**
   1433 W. Humbolt
   Fort Worth, TX 76104
   (682) 885-7080

Dr. Miller is the Medical Director of Pediatric Surgery at Cook Children's Medical Center and is Board Certified in General Surgery since 1988. He has held a Certificate of Special Competence in Pediatric Surgery since 1990.

Dr. Miller performed surgery on Michael C. King, III to repair the esophageal damage caused by the CR2025. Based on Dr. Miller's education, training and experience, he is qualified to provide an opinion on the injury suffered by Michael C. King, III when he ingested the Lithium button battery. His Curriculum Vitae has been produced with his Expert Report. Dr. Miller is expected to offer the following testimony:

a) The injuries suffered by Michael C. King, III, the treatment for such, causation, short-term and long-term complications, and the increased risk of developing esophageal cancer.

b) That Michael C. King, III suffered a burn on the anterior wall of the esophagus extending approximately 3 cm in length caused by the ingested CR2025 battery.

c) The nature of and necessity for all medical procedures, that each procedure was medically necessary, and that each procedure was made necessary by the ingestion of the battery. All of the damage to his esophagus was the result of a chemical burn induced by the battery.

d) According to the available literature, the dangers associated with ingesting a button battery have been reported since 1983 or earlier. Articles have been published since 1977 regarding the potentially fatal complications from ingesting a button or coin cell battery and these dangers were well known by 1992 as reported by Dr. Toby Litovitz in her published study of 2382 cases.

e) The damage to Michael's esophagus and formation of the tracheoesophageal fistula was a direct result of the injury caused when the button battery was lodged in his esophagus. The button battery was not lodged long enough to cause necrosis by direct pressure.

f) That Energizer and this industry should be aware that the button batteries will burn a hole in the esophagus.

g) That, as reported, the cause of this type of lithium battery ingestion burn is related to a chemical reaction which creates an electrical current, creating sodium hydroxide, or else the battery contents leak out, and become wet with saliva, causing an alkaline burn to the surrounding esophagus. Some articles report the electric current created in the esophagus will cause a caustic burn, due to electrolysis from the combination of saliva and the energy in the battery.

h) That, irrespective of the mechanism of injury, Caustic burns are documented to increase the risk of esophageal cancer by 1000 fold. Michael had a caustic burn that puts his risk in this category of risk. Due to the ingestion of the battery, and the injury caused by the chemical reaction and burn, the alkalis produced a necrosis when they come in contact with the mucosa and penetrated deeply, resulting in full thickness burns. The disintegration of the mucosa occurs over a several day period after the ingestion occurred in Michael's esophagus. The continued destruction of the esophageal wall led to the inflammatory changes and subsequent development of the tracheoesophageal fistula. Because of the marked inflammatory reaction, it is not uncommon for strictures to develop following the alkali burn. Indeed, Michael required multiple dilatations in order to treat his esophageal stricture.

i) That, although Michael has recovered from the immediate injury related to the alkali battery ingestion, his esophagus will never be normal and that Michael's growth has been affected because of his inability to eat normally and have proper nutrition through diet.

j) That, in terms of long term risk, esophageal carcinoma (both adenocarcinoma and squamous cell carcinoma) is a late but serious complication of severe caustic injury. The incidence following caustic ingestion ranges from 2% to 30%, depending on the series, with the carcinoma developing one to three decades after the ingestion. The incidence is reported to be 1000 or more times the expected occurrence rate in patients of a similar age. Cancer is most commonly at the site of the tracheal bifurcation, an area of anatomic narrowing, and may be related to increased exposure to the caustic at this site. Dysplasia screening is recommended for patients following a severe caustic ingestion to allow for the early detection of precancerous changes. Esophageal bypass surgery does not prevent the development of esophageal cancer following a caustic ingestion. Any symptoms of dysphagia will have to be aggressively pursued. Should he develop esophageal carcinoma he will require a surgical resection and reconstruction of his esophagus. Depending on the extent of the tumor some of these reconstructions can require small interposition segments of colon or a complete esophagectomy and gastric pull-up. Both of these procedures have potential for continued problems with swallowing and potential risks of aspiration.

k) That Michael at this time has a constricted esophagus, and within reasonable medical probability he will continue to have such a narrowed esophagus for the remainder of his life which will affect his ability to eat normally, gain nutrition, and grow. Dr. Miller is further expected to testify regarding future medical care needs for Michael and the cost associated with such need.

l) The state of the available literature and that the literature is replete with articles that describe the problem button and coin cell batteries have created with chemical burns, and that some authors have offered solutions to the problem.

2. **Sterling Anthony**
   100 Renaissance Center – 43176
   Detroit, Michigan 48243
   (313) 531-1875

Mr. Anthony is an expert on the subjects of unreasonably dangerous packaging and inadequate warnings. For his qualifications, please see his curriculum vitae, which has been produced as Exhibit 1 to his Report.

Based upon his education, training, experience, research, review of professional literature, personal inspection, it is anticipated that Mr. Anthony will testify to the following:

a) The packaging of the Energizer CR2025 battery was unreasonably dangerous because it was not designed to eliminate the foreseeable possibility that a child might extract the battery and ingest it.

b) There are multiple ways a child, simply by exploratory handling, can exert pressure against the blister packaging of the CR2025, sufficient to push a battery through the back of the paperboard card.

c) The CR2025 packaging was not child-resistant as defined by the Consumer Products Safety Commission.

d) The CR2025 packaging was unreasonably dangerous because it gave the false impression of a level of protection higher than actual.

e) The CR2025 packaging was unreasonably dangerous because it failed to act as a safeguard to protect people against the ingestion hazard that is an inherent function of the small size of the battery.

f) Product packaging serves the functions of containment, protection, communication, and convenience.

g) Packaging should protect the people from harm and protect people from the harm that the product can inflict.

h) A prudent marketer is expected to know about public information regarding the safety of its products and should use packaging that delivers the requisite level of protection.

i) Technology within the packaging industry is capable of delivering packaging that would greatly reduce the incidents of children ingesting button batteries.

j) Such technologically-feasible packaging is also financially-feasible.

k) The "warning" on the CR2025 packaging was inadequate because it failed to comply with standards of content and format of warnings.

l) An ineffective warning is tantamount to no warning at all.

m) Given the potentially grave consequences of ingesting a battery, the "warning" on the CR2025 packaging should have been rendered more conspicuously, which would have been achieved by changing the proportioning and arrangement of graphic elements.

n) The CR2025 packaging should have had prominent wording on the front of the package directing the consumer to look on the back and to read and heed all warnings.

o) Energizer did not perform the necessary testing to ensure that consumers could perceive the warning on its CR2025 packaging, recognize the warning, and interpret its message.

p) Energizer evidenced a depraved indifference regarding the safety of its product.

q) The CR2025 was rendered defective and unreasonably dangerous because it did not conform to reasonably prudent standards-of-care for packaging and warning.

r) Energizer placed into the stream of commerce an item that was unfit to fulfill its intended purpose, thus breaching implied and express warranties.

3. **W. Andrew Harrell, M.A., Ph.D., J.D.**
   388 E. Ocean Blvd., #1108
   Long Beach, CA 90802

Dr. Harrell has a Ph.D. from the University of Washington in 1971 in experimental social psychology, child development and statistics. He specializes in human factors research, and has conducted research on a variety of topics. Dr. Harrell is designated to speak on and render opinions concerning:

a) The efficacy of defendant's labeling and packaging of its size 2025 button batteries as factors in the injuries to the plaintiff incurred when he ingested on the defendant's products.

b) The role that supervision by plaintiff Michael C. King, III's parents, Michael and Diana King, may have played in the incident.

c) The role of the science of human factors analyzing warnings, signs and informational materials and labels including noticeability (whether or not someone sees the label), readability (whether or not the label is read), comprehensibility (whether the message is understood) and useability (whether or not the message is acted upon).

   a. *Readability.* An essential requirement for an effective product warning is that it must be readable, i.e., the content of the message must be tailored for the reading ability of the typical consumer of the product. The average purchaser would be unlikely to read the entire warning on the Energizer CR2025, and would be unlikely to either recall the information in the warning or act on it. Most significantly, even for consumers with much higher educational levels and higher reading abilities, there would be a lower probability that a warning label such as the Energizer label would be read. The Energizer warnings violate ANSI standards for effective warnings as well as standards of Flesch-Kincaid readability established in the scientific literature.

   b. *Safety Alert Symbols.* ANSI standards, published by the National Electronics Manufacturers' Association to which Energizer belongs, with respect to product label warnings recommend in the case of a personal injury hazard that a warning be accompanied by an equilateral triangle surrounding an exclamation mark. The purpose of the alert symbol is to call attention to the warning content. The scientific literature has shown that alert symbols, warning borders, and other physical features of warnings increase noticeability which, in turn, increases the likelihood that a consumer will read, understand and act upon a warning. In the case of the Energizer warnings, a safety alert symbol was absent. The absence of a safety alert contributed to a failure to read, appreciate or act upon the warning message in the present case, i.e., to keep the product away from the injured child.

c. *Signal Words.* ANSI recommends DANGER, WARNING and CAUTION as appropriate signal words denoting a degree or level of hazard seriousness, with DANGER denoting the highest level. Based on the medical literature on injuries to children from swallowing button batteries which indicates a very high risk of serious injury or death, DANGER rather than WARNING is an appropriate signal word for the Energizer product due to the serious nature of the potential hazards and risks which include choking, chemical burns to the esophagus, an increased risk of cancer, and death. The Energizer warnings were deficient in not using DANGER as a signal word, and that this deficiency resulted in a less effective warning. The parents of the injured child would have be more proactive in denying access to the defendant's batteries if DANGER had been used as a signal word.

d. *Absence of borders.* ANSI recommends that safety labels have contrasting borders to achieve distinctiveness, i.e., to separate the warning out from background clutter and to enhance noticeability. The warning for the 2025 Energizer battery was not visually separated from other text on the back of the package. This means that a consumer's attention was not directly to the warning any more than their attention was directed to less important information on trademarks or manufacturers. This deficiency in defendant's product resulted in the plaintiff failing to fully read and appreciate the product warning.

e. *Absence of contrasting background for signal words.* ANSI recommends that the signal word DANGER have a red background, and that the signal word WARNING have an orange background. This is to increase noticeability and distinctiveness so that the warning is not lost in background clutter. The defendant's warning lacked a color background, so it failed to comply with this ANSI standard. This deficiency in defendant's product resulted in the plaintiff failing to fully appreciate the product warning.

f. *Inadequate letter size.* ANSI recommends that lettering be of a size that enables a person with normal vision, including corrected vision, to read the label. Defendant's label was deficient in this regard. The font size was extremely small. Indeed, it is barely readable, requiring considerable focus and attention to understand the message. The font size does not attract or alert the reader or potential user of the importance of the warning. In addition, there was both vertical and horizontal compression of the lettering. Research has shown that the combination of small font size and compression reduce the likelihood that a warning will be noticed, fully read, comprehended and acted upon. This deficiency in defendant's product resulted in the plaintiff failing to fully read and appreciate the product warning and the dangers and hazards associated with the product.

g. *Absence of proper warning content.* It has been well established in the scientific literature that symbols/pictorials as well as written text should communicate the type of hazard, level of seriousness, consequences of the hazards, and evasive or avoidance action that should be taken. In the case of defendant's battery warning, remarkably, there was no information relating to the type of hazard (e.g., choking, lodging in the

trachea or esophagus, chemical burns) or consequences (e.g., death or injury from choking or chemical burns and a subsequent multi-fold increased risk of developing esophageal cancer after such a chemical burn), even though these type of hazards and consequences have been widely published and known to the defendant. The relevant literature has shown that warnings that communicate the nature of the hazard and personal injury consequences associated with the hazard are much more effective in motivating consumers to take effective evasive or avoidance actions. This deficiency in defendant's product resulted in the plaintiff failing to fully appreciate the dangers and hazards associated with the Defendant's product.

    h.  *Ineffective warning format.* ANSI recommends that the content of warning messages be arranged in an outline format, with separate sentences arranged vertically with white space between them. A number of scientific studies of warnings and labels have documented that this format increases readability, comprehension and compliance with warnings. The least effective format is a continuous prose arrangement of sequential sentences; i.e., precisely the format used by the defendant. While the sequential format maximizes limited space on packaging, it negates the purpose of the warning which is to inform the consumer of hazards and to evoke appropriate evasive or avoidant actions to ensure safety. This deficiency in defendant's product resulted in the plaintiff failing to fully appreciate the dangers and hazards associated with the Defendant's product.

    i.  *Prominence of warnings.* It is significant that there were no warnings on the front of the defendant's packaging. The colorful information on the front of the packaging, presented in large fonts with accompanying symbols, pertains exclusively to the defendant's product logo as well as product size and use information. This is the information that literally will capture and focus the purchaser's attention. Warning information was consigned by defendant to the back of the package, and was nested between the bar code and information on trademarks and manufacturing. It has been well established in the scientific literature that information on the back of packaging, as well as information that is nested within other information, lacks the prominence or distinctiveness to be noticed, read, comprehended and acted upon. This deficiency in defendant's product resulted in the plaintiff failing to fully appreciate the dangers and hazards associated with the Defendant's product.

d) *Packaging.* The strength and dexterity required to remove one or more of the batteries from this style of packaging are well within the competencies of a significant numbers of children under the age of 5. Energizer has clearly failed to incorporate the relevant scientific literature in designing its product packaging and in attempting to make it child-resistant. Indeed, the packaging could be readily breached by a significant percentage of children under the age of 5 years. The defendant's packaging gives the illusion of being child-proof, thereby lessening the vigilance of parents or caretakers in denying children access to these products. The risks of serious injury and death to children under the age of 5 years from ingesting these button-size or coin size lithium batteries are abundantly documented in the medical literature as well as in the various button battery ingestion studies provided by defendant through discovery. This company knew of the risk of harm and did nothing to properly guard against the risk, or warn

of the nature and extent of the risk of harm. Their conduct was that of conscious indifference to the rights and welfare of the user and buyer- the public.

e) *Parental supervision.* Though there are considerable variations between parents and other child caretakers in the degree of supervision, parents rarely watch children 100% of the time. Instead, most supervision is intermittent, with adult caretakers carrying out periodic check-ins to see if their children are safe while they multitask. This is reasonable behavior. In the present case, the injured child was engaged in play activities in a playroom of his house, along with an older sister. The plaintiff parents carried out laundry activities, and entered and left the playroom frequently. The parents of the injured child regarded the playroom as "a safer area" with no obvious hazards being salient. Furthermore, given the absence of any effective warnings on the Energizer battery package and what appeared to be a "child-proof" packaging by Energizer, the parents were not aware of the need for greater levels of supervision because the dangers and hazards of the Energizer battery were not made known to them. The supervision by the parents of Michael C. King, III was comparable to that of similar conscientious parents in North America and was not negligent. They acted as reasonable and responsible parents. Further, it would be unreasonable to expect intense, constant parental supervision when a child was in the presence of Energizer's products given that parents are not properly warned and by the illusion of child-proofing conveyed by the packaging.

4. **Tom Heckman**
   292 Everett Place
   Tonawanda, NY 14150
   (716) 361-7874

Mr. Heckman is an electrical engineer and he is designated to speak on and render opinions concerning:

a) The manner in which the lithium and alkaline type button batteries are made, function, are linked for power in a series, form electrolysis in the saliva of the mouth, and how they burn the esophagus and did burn the esophagus of Michael King III.

b) The negligence and/or fault of the defendant; that the battery is unreasonably dangerous;

c) That the ordinary consumer with ordinary knowledge of the product does not foresee the risk of harm that the battery will burn the esophagus and/or cause cancer.

d) The defects in the design, manufacture, and marketing of the product, and that it is and was unreasonably dangerous when sold;

e) The industry is not governed by safety rules or standards that protect children from esophageal burns;

f) The industry is aware of the risk of harm and has not taken action to prevent children from being harmed when the battery type in question is ingested and stuck/lodged in the esophagus;

PLAINTIFFS' DESIGNATION OF EXPERTS   Page 8

g) How the battery in question works, and how it can be re-designed to ameliorate or eliminate the risk of esophageal burns by electroysis;

h) What the ANSI C18 Committee does and what its function is; what it does not do.

i) Why this battery is ultrahazardous and powerful enough to burn children that have it lodged in their esophagus;

j) Recommendations to make the battery less dangerous by design changes, warnings, risk assessment, and packaging;

k) The gross negligence of the defendant in failing to warn, properly package, and design the battery to forestall or reduce the electrolysis.

l) Each item mentioned below in the numbered items;

m) The literature on batteries and the warnings that have been promulgated by the CPSC and the Poison Control groups.

Further, Mr. Heckman will testify to the following:

a) The industry has been aware of the risk of ingestion of button batteries since at least 1983. The C18 standards published by ANSI only address this risk by identifying geometrically small batteries ("small parts" choking hazards per US Toy regulations) and then requiring a "Caution for ingestion" on the battery or packaging.

b) In my opinion, the ANSI C18 committee work does not cover the toxicity risk that may result from the ingestion of a lithium battery or its contents, or any unique toxicity concerns for ingestion any particular chemistry of battery.

c) Neither the form of packaging, nor internal construction of batteries are dictated by standard, and these matters are left up to the manufacturer. ANSI C18 standards do specify some markings that are required on the battery and/or packaging. The potential for electrolysis and burns is not part of the ANSI C18 Standard.

d) In the United States, except for toys, battery operated consumer products generally do not have mandatory technical regulations or laws specific about using batteries.

e) Complications from ingesting batteries has been documented for years, and this hazard was specifically published in 1983 by the Consumer Product Safety Commission (CPSC). Majority of earlier cases at that time were based upon common batteries around the household, which were alkaline (1.5 V), silver oxide (1.5 V) or zinc-air (1.4 V).

f) CR2025 batteries are lithium manganese dioxide chemistry batteries, capable of a nominal 3.0 volts. These batteries have become more common for consumers over the past decade or so as newer thinner electronic devices are marketed.

g) One form of harm from ingesting batteries is they can get stuck in the esophagus, and by nature of their voltage, start discharging electrical current into the fluids and tissues of the body; if the voltage is high enough, the current can cause electrolysis of water (breaking down the molecules of water). The literature states this electrolysis will cause chemical burns of the esophagus.

h) Pediatrics and Dr. James P. Miller's report indicate this battery type presents an extreme risk of serious injury or even death of caught in the esophagus and not removed within the first hours or earlier.

i) Lithium CR2025 cells have twice the voltage of other common consumer cells (alkaline, silver-oxide, zinc-air), and will produce a more vigorous electrolytic reaction if stuck in the esophagus than historically known cases with those other cells. This makes CR2025 batteries more hazardous for this type of electrochemical harm in my opinion.

j) New CR2025 batteries will have full nominal 3.0 voltage or higher, while depleted batteries will have lower voltages and be capable of less total current. Therefore new, unused batteries would be more hazardous than depleted batteries for this particular hazard, in my opinion.

k) Lithium CR2025 cells are 20 mm diameter cells, and are larger in diameter than most common alkaline, silver oxide, or zinc-air button cells such as used in toys or hearing aids. Those batteries are 11.6 mm or smaller in diameter, and in my opinion, the larger 20 mm diameter CR2025 would be more likely to become stuck in an esophagus than those smaller 11.6 mm diameter button cells.

l) Risk analysis, hazard assessment, or similarly named techniques exist, and existed at the time prior to the incident, that would allow safety engineers who evaluate products or introduce new designs to systematically asses those products and designs for hazards, document those hazards, consider their severity and probability, and decide means to mitigate those risks.

m) According to Energizer's objections and answers to plaintiff's corrected and amended first set of interrogatories, received June 11, 2011, for interrogatories 3, 4, 5, and 12 no outside party has performed such risk analysis or hazard assessment on this product design.

n) Energizer should have performed, but did not appear to perform a risk assessment (based on provided responses to interrogatories), and should have identified ingestion hazard at least by 1983 per the CPSC announcement, then done safety improvement or safety mitigation in order to make the product safer. Particularly, because of the high degree of harm (severity) of the hazard, as to harming infants and children. In the following order, the considered mitigations would be:

    i. Re-design of the cell itself, (eliminate hazard)

    ii. Use proper packaging with child proof guards/barriers/packaging/protection systems (prevent access to hazard)

    iii. Place more obvious (by placement, color, text size, clarity) warnings of the nature and extent of the risk of harm on the package, with instructions to parents concerning severe esophageal burn hazard for injury or death. (notify of the hazard)

o) Based upon the testimony of Mr. and Mrs. King that the package was closed and Trip opened it, and based upon that there were no special protective coatings, barriers, over-sleeves, or the like on the cell that would have been removed prior to use, it does not appear that Energizer made special packaging design considerations to mitigate this risk.

p) A plastic insulating barrier on all or part of one side of the cell would more likely than not prevent electrical circuit forming if swallowed, or could minimize the current causing electrolysis. I base this opinion on the sound electrical engineering principle of conduction of electricity, which could not occur with this battery, thus preventing electrolysis, if one side of the cell was completely insulated.

q) Energizer's warning on the package did not address the nature and extent of the severe esophageal damage, or even death, that could be caused by ingestion of a 3 V lithium CR2025 battery; based upon the testimony of Mr. and Mrs. King, they were unaware of the electrolysis mechanism and the specific electrochemical mechanism of harm that could result if such battery was ingested and lodged in a child's body.

r) It is technologically feasible to run products with button batteries of 16 mm or smaller, either alone, or in parallel, and thus reduce the risk of a battery becoming stuck in the esophagus because of its having a 20 mm diameter. The voltage of a single smaller diameter battery or parallel system would be the same. The total capacity (battery life) would be based upon total volume of the cell or cells. This method to reduce this risk of harm or death was discussed in an article written by Dr. Yardeni. See: "Severe esophageal damage due to button battery ingestion: Can it be prevented?" by D. Yardeni, H. Yardeni, A.G. Coran, and E.S. Golladay. This doctor suggests batteries should be used in sizes small enough to not lodge in the esophagus. This is discussed in his article at Page 501.

s) According to Dr. James P. Miller's report, there is an estimated 1000 fold increased cancer risk associated with esophageal battery burn incidents. (page 3)

t) Dr. Miller reports that the object removed was an Energizer button battery; the parents found the packaging and testified it was an Energizer bought from Wal-Mart. Therefore, within reasonable probability, the cause of the burn to the child was the Energizer battery.

u) The opinions I have given are based on usual and customary engineering practices and/or risk assessment, I have relied on peer-reviewed literature and standard engineering practices, accepted in the peer group of electrical engineers.

v) I have consulted with Dr. Robert Hamlen, expert in this matter, concerning the electrolysis that occurs with the lithum battery while in the esophagus.

w) The feasibility for the suggested corrective actions to supplant the CR 2025 by using a series of smaller batteries of 16mm is clear; the error rate for this corrective action is therefore effectively zero. It can be done as a design trade off. The probability of reduction in esophageal lodgments with such diameter design would have to studied or modeled, but smaller diameter would certainly diminish the chance of lodgment. The error rate for insulating one-half of the battery to insulate it from electrolysis is dependant upon the degree of mitigation and materials used, and how secured to the battery. The error rate for improving packaging barriers to prevent access by a child would have to be studied based upon selected packaging, but I estimate could be highly effective. The error rate for warning prominence could also be studied.

x) The battery presents an extreme risk of harm to children and infants, and in my opinion this is not acceptable; some remediation in warnings, packaging and either insulation or use of only smaller batteries needs to occur to stop the electrolysis when the battery is ingested.

y) The Energizer company failed to use reasonable care to guard, warn, package, and remediate the electrolysis to prevent the risk of harm suffered by Trip King;

z) From what I have observed, Energizer has not done anything to eliminate the risk of harm; the utility of the product as sold did not outweigh the risk of harm, due to reasonable alternative methods of supplying alternative power.

5. **Lewis Charles Barbe**
   6320 Limerick Lane
   Edina, MN 55439
   (952) 941-6319

Mr. Barbe is a Registered Safety Engineer. He is Registered by the Board of Certified Safety Professionals, Board of Product Safety Management, and Board of Hazardous Material Managers, to name a few. His Curriculum Vitae is attached to his Expert Report.

Based upon his education, training, experience, research, review of professional literature, personal inspection, it is anticipated that Mr. Barbe will testify to the following:

a) Mr. Barbe will testify regarding warnings and industry standards, such as ANSI specifications and how to warn of the risk of serious injury or death if ingested due to chemical reaction with the body, and the cancer risk.

b) He may testify on the topic of child proof packaging, and that it exists and is used by Energizer on larger flashlight size batteries. He will explain why and how it could have readily been used with this existing package technology.

c) That the current Energizer package and warning for the CR 2025 are deficient and explain why.

d) He will explain what should have been used and the type point that would be appropriate using the ANSI standards, and other standards.

e) He will testify how the battery was defective [unreasonably dangerous], at the time of sale due to the lack of compliance with basic principles of Engineering to reduce or eliminate serious injury or death and a risk of cancer.

f) He will discuss the information on the packet shows that Energizer knew of these types of hazards and provided incomplete information but not proper warnings against the foreseeable use of the battery and Energizer allowed the hazard to exist for years.

g) That a foreseeable misuse of a product by a child or infant does not excuse the requirements for childproof packaging, and proper adult warnings of the nature of an extent of the risk of serious injury or death.

h) The cause of the injury was the defective design, manufacture, marketing, and by the negligence of the defendant in failing to properly warn, package, reduce or eliminate the electrolysis, and/or leakage of the battery in the esophagus, heed CPSC and Poison Control warnings, act responsibly to protect children, use state of the art technology for packaging and warning, and failing to have a products liability safety program, failing to test the battery, failing to admit to and eliminate the risks of harm, use engineering and risk assessment, correct the deficiencies in the battery that allow it to burn the esophagus of children.

i) The cause of the injury to Mr. Michael C. King 111 was the unreasonably dangerous characteristic of the CR 2025 to form a strong chemical reaction in the body, burning the esophagus. Further, if read, it fails to warn of the nature of and extent of the risk of burns in the esophagus and serious injury, death or cancer.

j) The Battery swallowed by Michael C. King 111 was inherently dangerous.

k) The company had an inadequate product safety program, as reflected in its injury history reaction, and answers to plaintiff's interrogatories at question "3" concerning compliance with 16 CFR 1700. It did not voluntarily comply with this safety packaging standard, knowing children and infants were swallowing the CR 2025 type battery;

l) He will explain the answers to discovery reveal a lack of safety, planning, testing, consumer surveys, record-keeping, and willingness to correct the defects despite warnings from the National Capital Poison Center in Washington D.C as early as 1998. No. 4 & 5: No documents revealing any testing to determine if the battery would corrode, leak, or deteriorate if ingested or lodged in an infant's esophagus; no product liability safety design manual," which is level 1 for safe manufacturing rules.

m) Per interrogatory No. 6: No testing was done to see if the package was child proof under 16 CFR 1700; Per No. 7: The company acknowledges that the National Capital Poison Control

Center warned them of battery ingestions as early as 1998, and this exhibit "A," contains histories of children with burned esophagus from lithium battery ingestion. For example a 30-month-old child had an incident with a lithium battery in case no 6102, at page 21 of the exhibit with esophageal burns and strictures, after ingesting a 20mm battery. Per No. 8-12: This company buys batteries from Sony, Matsushita, Sanyo and perhaps others. This should have been disclosed in answers to interrogatories but was not. It has no consumer surveys of what consumers want in childproof packaging. Per No. 15: No minutes of meetings exist to show discussions of the dangers of button batteries by Energizer at safety meetings. Per No. 16: No written material was produced by this company pertaining to warnings and planning related to them, indicating the company is refusing to share information on this topic.

n) Energizer did not provide remedial engineering and corrective action to eliminate the design defects.

o) Energizer allowed the hazardous conditions of the Battery to exist without warning or remedial measures for at least 15-18 years before the incident and another 8 years after it; this conduct ultimately caused Mr. Michael C. King 111 incident.

p) Energizer showed conscious indifference to the safety of the public, and the plaintiff, knowing of the risk of harm and acting with intent not to warn, offer child-proof packaging, or insulate the battery so it would not create hydrolysis as described in the reports in the literature of the cause of the type burns that "Trip" received.

q) Mr. Barbe relies in part on the report of Robert Hamlin with citations, and articles by Dr. Yoshikawa, Asia, and others in Critical Care Medicine 1997, page 2042, and the National Capital Poison Center article on "Mechanism of Battery- Induced Injury," published in June of 2011, Dr. Litovitz's 1985 article, "Battery Ingestions: Product Accessibility and Clinical Course,"  And that of Tanaka J, Yamashita M, Yamashita M. Esophageal electrochemical burns due to button type lithium batteries in dogs. Vet Hum Toxicol 1998; 40(4):193-196.

r) The Battery was not designed and manufactured free of recognized hazards.

s) Energizer had reason to anticipate that danger of children ingesting batteries.

t) The battery was a defective product because it failed to perform in the manner reasonably to be expected by consumers.

u) The ordinary consumer would not foresee this risk of harm.

v) Mr. Michael C. King Jr. and his wife exercised the requisite degree of care, expected of a parent of like age and experience, intelligence and capacity when the injury occurred.

6. **Robert P. Hamlen, Ph.D.**
   201 Farmington Woods Court

       Holmdel, NJ 07733
       (732) 671-3798

Dr. Hamlen will render opinions on the chemical reaction of saliva and how the electrolysis is created in the body that produces alkaline solutions, sodium hydroxide, and burns the esophagus; that this phenomena has been known to the industry for at least 35 years, and was not addressed in the manufacture, design, packaging, or warnings made by Energizer making this battery unreasonably dangerous to the public;

He has conducted laboratory experiments that explain the electrolysis process, and may show this experiment and its results in court or on video and with drawings and photos. Dr. Hamlen will discuss and explain:

    a)     Opinion #1. This product presents an extreme risk of harm because it is a high voltage lithium battery, 3 volts, compared to the more conventional button cells, which are 1.5 V. It also has a larger diameter, 20 mm, which poses a greater risk of getting stuck in the esophagus in a child than do the smaller button cells. In 1983 the Consumer Product Safety Commission issued a warning on button batteries (Ref. 2).;

    b)     Opinion #2. The nature of the potential damage from a 3 V lithium coin cell, such as the CR2025, is significantly more serious than that caused by a 1.5 V aqueous button cell battery. First, the larger diameter increases the probability that it can get stuck in a child's throat, and second, 3 V provides a significantly higher driving force for the reaction. And third, the neutralization of the chemical reactions occurring on the flat surfaces of the coin cell means that the chemical produced in the center of each of the flat electrodes are more isolated from those issue the caustic produced will have a greater chance to react with the tissue than would be the case with a smaller cell;

    c)     Opinion #3: It is my opinion that based on the seriousness of the consequences in the event of an ingestion of a 20 mm diameter lithium battery there should be a PROMINENT warning on the package stating something like, "WARNING! KEEP FROM CHILDREN! POTENTIALLY FATAL IF INGESTED!"; and

    d)     Opinion #4: The packaging should be child-proof, or as near so as is reasonable possible.

    e)     Dr. Hamlen will also discuss the warnings promulgated by the CPSC and the poison control center; He will discuss the failure of Energizer to act reasonably to reduce or eliminate the risk of harm associated with ingestion of the battery. He will explain that the cause of the burn to Trip King was the chemical reaction in the body between the saliva and the battery electrolysis.

B. **PLAINTIFFS MAY CALL ADVERSELY ANY EXPERT DESIGNATED BY DEFENDANT.**

C. **PLAINTIFFS RESERVE THE RIGHT TO DESIGNATE EXPERTS IN ACCORDANCE WITH FED. R. CIV. P. 26(a)(2)(D).**

Respectfully submitted,

By: *[signature]*

**FOSTER & SEAR, L.L.P.**
Scott W. Wert
Texas State Bar #00794835
817 Greenview Dr.
Grand Prairie, Texas 75050
Telephone (817) 633-3355
Facsimile (817) 633-5507

And

**LAW OFFICE OF S. REED MORGAN, P.C.**
S. Reed Morgan
Texas State Bar #14452300
Federal ID #6080
P.O. Box 38
Comfort, Texas 78013
Telephone (830) 995-2464
Facsimile (830) 995-2728

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served upon all counsel of record *via certified mail, return receipt requested* on this 15th day of June, 2011:

*[signature]*

SCOTT W. WERT

Jason W. Fatheree,
S. Wesley Butler
Crouch & Ramey, L.L.P.
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201