

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2011 AUG 15 PM 3: 13

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| MICHAEL C. KING, JR., ET AL., | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | NO. 4:10-CV-757-A |
| | § | |
| | § | |
| ENERGIZER HOLDINGS, INC., | § | |
| | § | |
| **Defendant.** | § | |

## BRIEF IN SUPPORT OF DEFENDANT ENERGIZER HOLDINGS, INC.'S
## MOTION FOR SUMMARY JUDGMENT

**Jason W. Fatheree**
State Bar No. 24027162
**S. Wesley Butler**
State Bar No. 24045593

**CROUCH & RAMEY, L.L.P.**
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 922-7100
Fax (214) 922-7101
jfatheree@crouchfirm.com
wbutler@crouchfim.com

**ATTORNEYS FOR DEFENDANT
ENERGIZER HOLDINGS, INC.**


## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iii

I.    INTRODUCTION .....................................................................................1

II.   STATEMENT OF UNDISPUTED FACTS .................................................3

      A.   The Incident. ..................................................................................3

      B.   Michael King, Jr. Threw Out the Battery, its Alleged Packaging and the
           Baby Bottle Piggy Bank...................................................................3

      C.   The Identification of the Battery and Package by Plaintiffs. ....................3

      D.   The Packaging of the Energizer CR2025 Battery in January 2003. .........5

      E.   The Risks Associated With Battery Ingestion are Common Knowledge
           and Open and Obvious......................................................................6

      F.   Plaintiffs' Failure to Read the Warnings. .............................................6

      G.   Energizer's Warning Exceeds Recognized Standards. ............................7

      H.   The CR2025 Battery is Not Defective or Unreasonably Dangerous. ........8

      I.   No Safer Alternative Design Exists. ....................................................8

      J.   No Competent Evidence of Plaintiffs' Damages. .................................14

III.  ARGUMENT...........................................................................................15

      A.   Summary Judgment Standard. ..........................................................15

      B.   Plaintiffs Cannot Identify the Product at Issue in this Lawsuit. ..............16

      C.   Plaintiffs Cannot Establish that that the Product Reached Plaintiffs
           Without Substantial Changes in its Condition From the Time it Was
           Originally Sold...............................................................................18

      D.   Plaintiffs Cannot Establish Causation.................................................18

      E.   Plaintiffs Cannot Prove the Essential Elements of their Manufacturing
           Defect/Negligent Manufacturing Claim. .............................................20

F.      Plaintiffs Cannot Prove the Essential Elements of their Marketing Defect or Negligent Failure to Warn Claims..................................................................21

G.      Plaintiffs Cannot Prove the Elements for a Design Defect Claim Because They Cannot Show that a Safer Alternative Design Existed. ...............................26

H.      Plaintiffs Cannot Prove the Elements for a Design Defect Claim Because they Cannot Show that the Product at Issue was Unreasonably Dangerous..........34

I.      Plaintiffs Cannot Prove the Essential Elements of their Express Warranty Claim.................................................................................................................36

J.      Plaintiffs Cannot Prove the Essential Elements of their Implied Warranty of Merchantability Claim. .....................................................................................37

K.      Plaintiffs Cannot Recover Damages for "Fear of Future Disease or Condition." .........................................................................................................38

L.      Plaintiffs Cannot Recover Damages for "Cost of Medical Monitoring and Prevention in the Future." ................................................................................41

M.      Plaintiffs Have No Evidence to Support Their Claim of Loss of Earning Capacity. ..........................................................................................................42

N.      Plaintiffs Have No Evidence of Future Medical Expenses....................................43

O.      Plaintiffs' Claims for Exemplary Damages Fail as a Matter of Law....................43

IV.      CONCLUSION..............................................................................................................44


## TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co., Inc. v. Grinnell,*
   951 S.W.2d 420 (Tex. 1997)..................................................................... 20, 24

*Bic Pen Corp. v. Carter,*
   09-0039, 2011 WL 2420125 (Tex. 2011) ........................................................ 20

*Caterpillar, Inc. v. Shears,*
   911 S.W.2d 379 (Tex. 1995).............................................................. 24, 25, 34

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1982).................................................................................. 16

*Elliott v. Kraft Foods N. Am., Inc.,*
   118 S.W.3d 50 (Tex. App.-Hous. [14th Dist.] 2003, no pet.)........................... 37

*Exxon Corp. v. Makofski,*
   116 S.W.3d 176 (Tex.App.-Hous. [14th Dist.] 2003, pet. denied) .............. 40, 41

*Foltz v. Smith & Wesson Corp.,*
   No. 3:08-CV-0858-K, 2009 WL 2596598 (N.D. Tex. Aug. 20, 2009) ......... 22, 23, 24, 26

*Gaulding v. Celotex Corp.,*
   772 S.W.2d 66 (Tex. 1989).................................................................... 2, 16

*General Motors Corp. v. Saenz,*
   873 S.W.2d 353 (Tex.1993).................................................................... 18

*Gillespie v. Century Products Co.,*
   936 S.W.2d 50 (Tex. App.-San Antonio 1996, no writ)............................ 22, 23

*Hanus v. Texas Utils. Co.,*
   71 S.W.3d 874 (Tex.App.-Fort Worth 2002, no pet.)..................................... 24

*Honda of Am. Mfg., Inc. v. Norman,*
   104 S.W.3d 600 (Tex. App.-Hous. [1st Dist.] 2003, pet. denied................... 27, 33

*Hyundai Motor Co. v. Rodriguez,*
   995 S.W.2d 661 (Tex.1999).................................................................... 18

*Koenig v. Purdue Pharma Co.,*
   435 F. Supp. 2d 551 (N.D. Tex. 2006) ..................................................... 2, 19

*Lozano v. H.D. Indus., Inc.,*
   953 S.W.2d 304 (Tex.App.-El Paso 1997, no pet.) ......................................... 24

*Lucas v. Tex. Indus., Inc.,*
 696 S.W.2d 372 (Tex. 1984)........................................................................ 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986)................................................................................ 15

*Morris v. Adolph Coors Co.,*
 735 S.W.2d 578 (Tex. App.-Fort Worth 1987, writ ref'd n.r.e.)............................. 2, 18, 36

*Motor Co. v. Rodriguez,*
 995 S.W.2d 661 (Tex. 1999)....................................................................... 2, 18

*Norwood v. Raytheon Co.,*
 14 F.Supp.2d 659 (W.D. Tex. 2006)....................................................... 40, 41, 42

*Plas-Tex, Inc. v. U.S. Steel Corp.,*
 772 S.W.2d 442 (Tex. 1989)....................................................................... 2, 18

*Pustejovsky v. Rapid-American Corp.,*
 35 S.W.3d 643 (Tex. 2000)................................................................... 38, 39, 41

*Rodrigues v. General Elec. Corp.,*
 204 F.Supp.2d 975 (E.D. Tex. 2001)............................................................. 2, 16

*Roland v. DaimlerChrysler Corp.,*
 33 S.W.3d 468 (Tex.App.-Austin 2000, pet. denied) ........................................ 24

*Rudes v. Gottschalk,*
 324 S.W.2d 201 (Tex. 1959)....................................................................... 2, 19

*Sanmina–SCI Corp. v. Ogburn,*
 153 S.W.3d 639 (Tex.App.-Dallas 2004, pet. denied).......................................... 43

*Scott v. Dorel Juvenile Group, Inc.,*
 773 F. Supp. 2d 664 (N.D. Tex. 2011) ................................... 19, 20, 22, 23, 24, 37

*Smith v. Louisville Ladder Co.,*
 237 F.3d 515 (5th Cir. 2001) ................................................................. 28, 33

*Temple-Inland Forest Products v. Carter,*
 993 S.W. 2d 88 (Tex. 1999)............................................................. 39, 40, 41, 42

*Timpte Indus. v. Gish,*
 286 S.W.3d 306 (Tex. 2009)................................................................. 2, 34, 35

*Union Pump Co. v. Allbritton,*
 898 S.W.2d 773 (Tex.1995).......................................................................... 18

*Uniroyal Goodrich Tire Co. v. Martinez,*
  977 S.W.2d 328 (Tex.1998) ........................................................................... 27

*Wright v. Ford Motor Co.,*
  508 F.3d 263 (5th Cir. 2007) ......................................................................... 22

**Statutes**

FED. R. CIV. P. 56(c) .......................................................................................... 15

TEX. BUS. & COMM. CODE § 2.316 ..................................................................... 36

TEX. BUS. COMM. CODE § 2.313-315 .............................................................. 2, 16

TEX. CIV. PRAC. & REM. CODE § 41.001(11)(A)-(B) ......................................... 44

TEX. CIV. PRAC. & REM. CODE § 41.001(17) ..................................................... 44

TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) ...................................... 2, 18, 27



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MICHAEL C. KING, JR., ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **NO. 4:10-CV-757-A** |
| | § | |
| | § | |
| **ENERGIZER HOLDINGS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**BRIEF IN SUPPORT OF DEFENDANT ENERGIZER HOLDINGS, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Energizer Holdings, Inc. files this Brief in Support of Defendant Energizer

Holdings, Inc.'s Motion for Summary Judgment and would respectfully show as follows:

## I.   INTRODUCTION

Michael C. King, Jr. and Diana King ("Plaintiffs") filed this suit as next friend on behalf

of their son Michael C. (Trip) King, III on August 30, 2010 against Energizer for strict product

liability, negligence, and breach of warranty. Plaintiffs seek compensatory and exemplary

damages.

This case arises out of an injury to Trip King in January of 2003. At the time, Trip was a

20-month old child. According to Trip's parents, they stored their household batteries in a clear

baby bottle piggy bank with a closed lid on the floor of the children's playroom. Trip was left

unsupervised and Plaintiffs allege that in a matter of two to five minutes, Trip managed to open

the baby bottle piggy bank, remove a package of Energizer CR2025 batteries, breach the

battery's original packaging and ingest a battery. Trip sustained injuries to his esophagus,

including a tracheoesophageal fistula.

Plaintiffs allege that the battery ingested by Trip was an Energizer battery, but the sworn testimony of both Mr. and Mrs. King, if taken as true, establishes that it could not have been an Energizer battery because Energizer did not offer for sale a CR2025 battery in the package described so emphatically and repeatedly by the Plaintiffs in their depositions. Additional summary judgment evidence confirms that Energizer did not offer for sale a CR2025 battery in the two-battery package identified by Plaintiffs.

Importantly, in order to prevail on any of their claims, Plaintiffs must establish (1) that the product in question was manufactured, designed, marketed or sold by Energizer[1], (2) that the product reached Plaintiffs without any substantial change in its condition[2] (3) that the product was defective in a manner that rendered it unreasonably dangerous[3], and (4) causation.[4] Lack of evidence on any one of these essential elements requires dismissal of all of Plaintiffs' claims.

The testimony of Plaintiffs and that of their own experts negates these essential elements and other elements of their specific claims, and Plaintiffs cannot adduce competent evidence to support several elements of their claims. Accordingly, Energizer is entitled to summary judgment on all of Plaintiffs' claims.

---

[1] *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989); *Rodrigues v. General Elec. Corp.*, 204 F.Supp.2d 975, 976 (E.D. Tex. 2001); TEX. BUS. COMM. CODE § 2.313-315.

[2] *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989); *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 582 (Tex. App.-Fort Worth 1987, writ ref'd n.r.e.).

[3] See TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a); *Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999); *Rudes v. Gottschalk*, 324 S.W.2d 201, 207 (Tex. 1959); *see also Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551, 553-54 (N.D. Tex. 2006).

[4] *See Timpte Indus. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).


## II.    STATEMENT OF UNDISPUTED FACTS

### A.    The Incident.

1.    Plaintiffs stored all of their household batteries, approximately 30-50 batteries, on the floor of the children's playroom in what they described as a clear, difficult-to-open, baby bottle piggy bank.[5]

2.    Trip ingested a battery on January 29, 2003, but no one saw him open the baby bottle piggy bank or the package, much less ingest the battery.[6]

3.    Trip and his four-year old sister were left unsupervised in the playroom for 2-5 minutes.[7]

### B.    Michael King, Jr. Threw Out the Battery, its Alleged Packaging and the Baby Bottle Piggy Bank.

4.    Mr. King discarded the baby bottle piggy bank, the original opened battery package and the battery itself after the incident. Accordingly, they have never been available for inspection by Energizer.[8]

### C.    The Identification of the Battery and Package by Plaintiffs.

5.    As Mr. King disposed of the battery and its packaging, Plaintiffs cannot produce the original product or packaging or even photographs of the original product or packaging.[9]

6.    Mr. King unequivocally identified that the product at issue came from a two-battery package with a perforated, cardboard backing.[10]

---

[5]   App. 0009, 0017, 0019-0020 (Ex. A, M. King Depo, p. 19, lns. 17-19, p. 55, lns. 19-21, p. 64, lns 19-22, p. 66, lns 7-9); App. 0038-0039, 0046 (Ex. B, D. King Depo p. 13, lns. 20-25, p. 14, lns. 1-5, p. 56, lns. 5-11).
[6]   App. 0041 (Ex. B, D. King Depo, p. 18, lns. 15-18).
[7]   App. 0016 (Ex. A, M. King Depo, p. 54, lns. 11-14).
[8]   App. 0010-0012 (Ex. A, M. King Depo, p. 34, lns. 24-25, p. 35, lns. 1-10, p. 38, lns. 7-14).
[9]   App. 0010 (Ex. A, M. King Depo, p. 34, lns. 10-16).
[10]  App. 0004-0006 (Ex. A, M. King Depo, p. 7, lns. 2-14, p. 8, lns. 1-25, p.9, lns. 1-6).

7.      Mr. King testified to seeing the two-battery package on the floor of the playroom after his son ingested the battery.[11]

8.      Mr. King testified that the cardboard backing was perforated, that one battery was hanging loose in the package after his son ingested the other, and that he bought this specific packaging at least a couple of times before this incident.[12]

9.      Mr. King was so *certain* that his son obtained the battery at issue from a two battery package that *nothing* could change his mind.[13]

10.     Mrs. King likewise testified that there was no question in her mind that it was a two-battery package.[14]

11.     Mrs. King did not recall seeing the package of batteries before Trip's ingestion.[15]

12.     Mrs. King saw the battery inside a container after it had been removed from Trip's esophagus, but she did not touch or examine the battery.[16]

13.     The only description of the battery Mrs. King could provide was that it was "The size of my watch, the face of my watch, the crystal on my watch. The color, the silver, shiny, pretty silver."[17]

14.     Mrs. King testified that the battery was an Energizer battery, but she based this conclusion on her belief that Energizer was the only brand her husband purchased for that size battery.[18]

---

[11]   App. 0004 (Ex. A, M. King Depo, p. 7, lns. 2-25).
[12]   App. 0004-0006, 0021-0024 (Ex. A, M. King Depo, p. 7, lns. 2-25, p. 8, lns. 1-25, p. 9, lns. 1-6, p. 72, lns. 20-25, p. 73, lns. 1-19, p. 87, lns. 20-25, p. 88, lns. 1-18).
[13]   App. 0004 (Ex. A, M. King Depo, p. 7, lns. 2-25).
[14]   App. 0032-0033 (Ex. B, D. King Depo, p. 6, ln. 25, p. 7, lns. 1-5).
[15]   App. 0033 (Ex. B, D. King Depo, p. 7, lns. 10-16).
[16]   App. 0035 (Ex. B, D. King Depo, p. 10, lns. 1-5, 22-24).
[17]   App. 0034 (Ex. B, D. King Depo, p. 8, lns. 4-12).
[18]   App. 0039 (Ex. B, D. King Depo, p. 14, ln. 15-18).

15. Mrs. King did not purchase the battery, her husband purchased it from Wal-Mart. Energizer did not make any express warranties or representations to Mr. or Mrs. King.[19]

16. Mrs. King did not handle the battery or its packaging.[20]

17. Mrs. King agrees that her husband is the best person to identify the battery and packaging.[21]

18. Mrs. King admitted that she has no knowledge as to whether the battery and its packaging remained unchanged from the time it left the manufacturer to the time that Trip ingested the battery.[22]

19. Mr. King admitted that he does not know if the battery or package had been altered from the time it left the manufacturer to the time Trip ingested the battery.[23]

**D.    The Packaging of the Energizer CR2025 Battery in January 2003.**

20. The CR2025 battery is a standardized battery sold by many different manufacturers. The "20" indicates that the battery is two centimeters in diameter, and "25" indicates that it is 2.5 millimeters thick.[24]

21. It is undisputed that Energizer did not manufacture or sell a CR2025 battery in a two-battery package with a perforated, cardboard backing in January of 2003 or at any time prior.[25]

---

[19]    App. 0036-0037, 0039-0040 (Ex. B, D. King Depo, p. 11, ln. 25, p. 12, lns. 1-2, p.15, lns. 10-11); App. 0008 (Ex. A, M. King Depo, p. 14, lns. 8-19).

[20]    App. 0039 (Ex. B, D. King Depo, p. 14, lns. 11-14).

[21]    App. 0037 (Ex. B, D. King Depo, p. 12, lns. 21-24); Mrs. King actually testified that "Other than Energizer representatives," no person could identify the battery and packaging better than her husband. Of course, Energizer cannot identify the battery or package because they have been discarded by Mr. King.

[22]    App. 0048-0049 (Ex. B, D. King Depo, p. 119, lns. 22-25, p. 120, lns. 1-3).

[23]    App. 0027 (Ex. A, M. King Depo, p. 158, lns. 11-23).

[24]    App. 0053 (Ex. C, Heckmann Depo. p. 33, lns. 3-19); App. 0088-0089 (Ex. D, Hamlen Depo, p. 65, lns. 21-25, p. 66, lns. 1-3).

[25]    App. 0112-0113 (Ex. E, Declaration of B. Lueckenotte at ¶¶ 6-12); See also, Plaintiffs' Response to Defendants Emergency Motion to Abate, p. 2, paragraph B [Filed Document #33].

22. Energizer did not introduce a two-battery package into the market for distribution until March 15, 2003.[26]

**E. The Risks Associated With Battery Ingestion are Common Knowledge and Open and Obvious.**

23. Plaintiffs both admitted that they knew before Trip's incident that the ingestion of a small object by a child could cause serious injury or even death.[27]

24. Plaintiffs' risk assessment expert, Thomas Heckmann, testified that the ordinary consumer – particularly a parent – should know to keep batteries away from children and that small objects such as coin cell batteries can be ingested by children and cause serious injury and death *very quickly*.[28]

**F. Plaintiffs' Failure to Read the Warnings.**

25. Neither Mr. nor Mrs. King even read the warning on the package before Trip's ingestion.[29]

26. Plaintiffs' risk assessment expert acknowledges that keeping the batteries away from children is a method of preventing all consequences of an ingestion of battery.[30]

27. Mr. King testified that he would not have done anything differently even if the warning had been larger and was on the front of the package. [31]

---

[26] App. 0113 (Ex. E, Declaration of B. Lueckenotte at ¶ 9).
[27] App. 0042-0044 (Ex. B, D. King Depo, p. 37, ln. 25, p. 38, lns. 1-6, p. 42, lns. 15-24); App. 0013-0015 (Ex. A, M. King Depo, p. 44, lns. 20-25, p. 45, ln. 1, 20-25, p. 46, lns. 1-4).
[28] App. 0054-0055, 0063-0064 (Ex. C, Heckmann Depo, p. 50, lns. 9-15, p. 51, lns. 7-25, p. 93, lns. 15-25, p. 94, lns. 1-3).
[29] App. 0006-0007 (Ex. A, M. King Depo, p. 9, ln. 25, p. 10, lns. 1-4); App. 0045 (Ex. B, D. King Depo, p. 43, lns. 13-16).
[30] App. 0056, 0079 (Ex. C, Heckmann Depo, p. 58, lns. 4-10, p. 157, lns. 15-23).
[31] App. 0018 (Ex. A, M. King Depo, p. 61, lns. 3-7).



### G. Energizer's Warning Exceeds Recognized Standards.

28. The Energizer CR2025 two-battery package initially identified by Plaintiffs[32] includes the following warning:

> **WARNING**: (1) Keep away from children. If swallowed, promptly see doctor, have doctor phone (202) 625-3333 collect (2) Battery can explode or cause burns if disassembled, charged or exposed to water, fire or high temperature. Keep in original package until ready to use and dispose of used battery promptly.[33]

29. Plaintiffs' expert testified that Energizer's warning not only complies with the United Laboratories (UL) and American National Standards Institute (ANSI) standards, it *exceeds* the minimum requirements of the UL and ANSI standards.[34]

30. Plaintiff's expert acknowledged that Energizer's warning was stronger than the UL and ANSI recommended warnings because Energizer used the signal word "WARNING" instead of "CAUTION." [35]

31. Plaintiff's expert further acknowledged that Energizer's warning was stronger than the UL recommended warning because Energizer put the statement "Keep away from children" as the first warning statement whereas UL included that statement in the middle of its recommended warning.[36]

32. Plaintiff's expert further acknowledged that Energizer's warning was better than the UL recommended warning because Energizer included a phone number for doctors to call in the event of an ingestion.[37]

---

[32] As noted above, it is undisputed that Energizer did not offer for sale the CR2025 battery in a two-battery package in January 2003. However, because Plaintiffs have alleged and identified same, Energizer addresses the warning on that package for purposes of this motion.

[33] App. 0114-0115 (Ex. F-1, Declaration of J. Fatheree).

[34] App. 0058-0061 (Ex. C, Heckmann Depo, p. 76, lns. 16-25, p. 77, lns. 1-25, p. 78, lns. 1-25, p. 79, lns. 1-9).

[35] App. 0058-0061 (Ex. C, Heckmann Depo, p. 76, lns. 16-25, p. 77, lns. 1-4, 22-25, p. 78, lns. 1-25, p. 79, lns. 1-9).

[36] App. 0059 (Ex. C, Heckmann Depo, p. 77, lns. 5-13).

[37] App. 0059 (Ex. C, Heckmann Depo, p. 77, lns. 14-21).

**H.     The CR2025 Battery is Not Defective or Unreasonably Dangerous.**

33.     Mr. Heckmann, Plaintiffs' risk assessment expert, testified that although the number of CR2025 batteries sold could easily get into the low *billions* of CR2025 batteries sold, there have been "relatively few" serious injuries or deaths.[38]

34.     Mr. Heckmann, Plaintiffs' risk assessment expert, does not believe the CR2025 should be removed from the market.[39]

35.     Many of today's technological devices and thinner and sleeker devices require a three volt battery such as the CR2025.[40]

**I.     No Safer Alternative Design Exists.**

36.     Plaintiffs' risk assessment expert, Mr. Heckmann, proposed several concepts for alternative designs, but he admits that his ideas for a safer design were merely concepts that may or may not be practical.[41]

37.     Mr. Heckmann acknowledges that he has never published any articles or journals regarding children's ingestion of button batteries, has never designed a battery, a single coin cell battery, and has never been involved in the manufacturing process of a lithium coin cell battery.[42]

38.     Mr. Heckmann acknowledged that while Plaintiff's counsel may have thought that he would come up with a "slam dunk solution" that would "solve this problem of how do you make this that is not hazardous" ---- that he did not think there was a slam dunk solution and

---

[38]   App. 0065-0066 (Ex. C, Heckmann Depo, p. 111, lns. 19-25, p. 112, lns. 1-20).
[39]   App. 0062 (Ex. C, Heckmann Depo, p. 89, lns. 14-20).
[40]   App. 0062 (Ex. C, Heckmann Depo, p. 89, lns. 14-20).
[41]   App. 0056-0057 (Ex. C, Heckmann Depo, p. 58, lns. 12-25, p. 59, lns. 1-6).
[42]   App. 0052 (Ex. C, Heckmann Depo, p. 16, lns. 9-20).

while there may be things that can be done, *whether those things are practical has to be determined*. [43]

39.     For example, Mr. Heckmann suggested an insulating barrier on all or part of one side of the cell to prevent an electrical current from forming. Yet, he admitted it was "entirely a concept at this point" and that he could not testify within a reasonable degree of scientific probability that such a concept would work in its application.[44]

40.     Mr. Heckmann even acknowledged that such a solution did not consider the utility of the product and that he had not even tested the concept yet.[45]

41.     Mr. Heckmann has not done a risk assessment of this concept, he has not calculated a rate of error for the concept, and the concept has not been peer reviewed.[46]

42.     Mr. Heckmann also advanced the idea of a nonconductive ring permanently applied to the outer edge of the negative face of the battery. But, again, Mr. Heckmann acknowledged that he had not determined whether such a concept would work.[47]

43.     Mr. Heckmann also acknowledged that he did not know whether the non-conductive ring concept would have prevented the battery from perforating the child's esophagus and that the concept had not been fully reviewed and realized, much less developed or in use by any other manufacturer. [48]

44.     According to Mr. Heckmann, the nonconductive ring is not even known yet in the scientific community, much less accepted.[49]

---

[43] App. 0056-0057 (Ex. C, Heckmann Depo, p. 58, lns. 12-25, p. 59, lns 1-6).
[44] App. 0067-0069, 0073 (Ex. C, Heckmann Depo, p. 119, lns. 14- 25, p. 120, lns. 1-25, p. 121, ln. 1, p. 127, lns. 15-20).
[45] App. 0069 (Ex. C, Heckmann Depo, p. 121, lns. 3-16).
[46] App. 0071-0072 (Ex. C, Heckmann Depo, p. 125, lns. 3-25, p. 126, lns. 1-14).
[47] App. 0074 (Ex. C, Heckmann Depo, p. 132, lns. 13-18).
[48] App. 0075-0076, 0078 (Ex. C, Heckmann Depo, p. 133, lns. 18-25, p. 134, lns. 1-17, p. 138, lns. 1-5).
[49] App. 0077 (Ex. C, Heckmann Depo, p. 137, lns. 22-25).

45.     Finally, Mr. Heckmann could not speak to the issue of how much his proposed nonconductive ring might add to the cost of the battery product.[50]

46.     Mr. Heckmann also proposed replacement of the twenty millimeter battery with a sixteen millimeter battery. However, he acknowledged that applications requiring a twenty millimeter battery would have to be redesigned and that there are millions of products requiring a twenty millimeter that would be rendered useless without a fitting to allow for a sixteen millimeter battery.[51]

47.     Mr. Heckmann conceded that although it is technologically possible to replace twenty millimeter batteries with sixteen millimeter batteries, the concept is somewhat absurd because it would render millions or billions of current products useless.[52]

48.     Not surprisingly, he could not speak to the issue of cost to the consumer of such a concept.[53]

49.     Not only did Mr. Heckmann fail to propose any safer alternative designs, he also eviscerated one of the key proposals of Plaintiff's other expert, Dr. Hamlen. Specifically, Mr. Heckmann opined that Dr. Hamlen's proposed alternative packaging design involving a removable plastic cap affixed to each coin cell battery was not a "good design" because the cap would constitute yet another separate choking hazard. [54]

50.     For his part, Dr. Hamlen, proposed an alternative battery design that involves a plastic or lacquer coating on the battery that is pierced by small pins to conduct electricity. However, even Dr. Hamlen admitted that he was not 100% sure that this idea would work and

---

[50]   App. 0078 (Ex. C, Heckmann Depo, p. 138, lns. 6-15).
[51]   App. 0080-0081 (Ex. C, Heckmann Depo, p. 159, lns. 4-25, p. 160, lns 1-2).
[52]   App. 0080-0081, 0083-0084 (Ex. C, Heckmann Depo, p. 159, lns. 4-25, p. 160, lns. 1-2, p. 163, lns. 22- 25, p. 164, lns. 1-4).
[53]   App. 0081-0082 (Ex. C, Heckmann Depo, p. 160, lns. 21-25, p. 161, lns. 1-11).
[54]   App. 0069-0070 (Ex. C, Heckmann Depo, p. 121, lns. 23-25, p.122, lns. 1-15).

acknowledged that it was "not a very practical solution" because millions of products would be rendered useless.[55]

51.   Dr. Hamlen further acknowledged that he was not aware of the scientific community accepting this concept, that he had not calculated the costs associated with making such design changes and that the lacquer coating was not a "preferred solution."[56]

52.   Dr. Hamlen could not testify with a reasonable degree of scientific certainty that this concept would have worked in the dog collar for which the battery was purchased.[57]

53.   Dr. Hamlen next proposed that the battery be wrapped in shrink wrap that would be unwrapped before the battery was used.  He acknowledged that this was a packaging design, and that he had conducted no tests to determine whether or not the shrink wrap was child resistant or whether the shrink wrap, once removed posed a separate choking hazard for a child.[58]

54.   Dr. Hamlen could offer no definitive insight into the toxicity, if any, of the shrink wrap or whether shrink wrapping a lithium battery might lead to the accumulation of gases that could cause the battery to explode.[59]

55.   Dr. Hamlen did no tests to determine whether the shrink wrap could stick to the battery and impair the battery's utility.[60]

56.   Dr. Hamlen did not calculate all of the costs associated with shrink wrapping batteries.[61]

---

[55]   App. 0090 (Ex. D, Hamlen Depo, p. 136, lns. 1-16).
[56]   App. 0093-0094 (Ex. D, Hamlen Depo, p. 141, lns. 11-17, p. 145, lns. 1-16).
[57]   App. 0091-0092 (Ex. D, Hamlen Depo, p. 137, lns. 24-25, p. 138, lns. 1-10).
[58]   App. 0096-0098 (Ex. D, Hamlen Depo, p. 151, lns. 3-6, p. 152, lns. 4-12, 25, p.153, lns. 1-4).
[59]   App. 0095-0096 (Ex. D, Hamlen Depo, p. 149, lns. 10-18, p. 151, lns 10-14).
[60]   App. 0098-0099 (Ex. D, Hamlen Depo, p. 153, lns. 24-25, p. 154, lns 1-7).
[61]   App. 0096 (Ex. D, Hamlen Depo, p. 151, lns. 7-9).

57. Dr. Hamlen also proposed a concept whereby a plastic coating or tape is placed on the negative electrode of the battery but removed before use. However, Dr. Hamlen acknowledged that even this was a packaging design, not a battery design.[62]

58. Dr. Hamlen is not aware of any manufacturer currently using this concept.[63]

59. Dr. Hamlen acknowledged that he has not even drafted a final design for this concept.[64]

60. Dr. Hamlen has not determined or calculated the cost to manufacture and implement this concept.[65]

61. Dr. Hamlen has not done any testing to determine whether children or elderly could remove the plastic coating.[66]

62. Dr. Hamlen has not done any testing to determine the risk associated with children removing the plastic coating and choking on it.[67]

63. Dr. Hamlen has not done testing to determine the rate of error for this concept.[68]

64. Dr. Hamlen also proposed a "bottle cap theory" where he proposed placing each CR2025 battery inside a plastic cap before packaging the battery. However, Dr. Hamlen acknowledges that he is not aware of any manufacturers of CR2025 batteries using this design in 2003 or currently.[69]

65. Dr. Hamlen has not even tested his "bottle cap theory" to see if a child could remove the battery from the cap.[70]

---

[62] App. 0102 (Ex. D, Hamlen Depo, p. 161, lns. 16-20).
[63] App. 0100 (Ex. D, Hamlen Depo, p. 159, lns. 6-15).
[64] App. 0100 (Ex. D, Hamlen Depo, p. 159, lns. 19-21).
[65] App. 0101 (Ex. D, Hamlen Depo, p. 160, lns. 5-16).
[66] App. 0101-0102 (Ex. D, Hamlen Depo, p. 160, lns. 17-25, p. 161, lns. 1-6).
[67] App. 0102 (Ex. D, Hamlen Depo, p. 161, lns. 7-10).
[68] App. 0103 (Ex. D, Hamlen Depo, p. 163, lns. 19-21).
[69] App. 0106 (Ex. D, Hamlen Depo, p. 169, lns. 7-13).
[70] App. 0107 (Ex. D, Hamlen Depo, p. 170, lns. 2-4).

66. Dr. Hamlen acknowledges that he "cannot legally testify" whether or not 20-month old Trip could remove the battery from the plastic cap.[71]

67. Dr. Hamlen has not submitted his "bottle cap theory" to any third party to see if it is an acceptable alternative design.[72]

68. Dr. Hamlen has not done any tests on his "bottle cap theory" to determine the potential choking hazard associated with the bottle cap.[73]

69. Dr. Hamlen has not determined the cost of manufacturing the plastic cap and placing it on the battery.[74]

70. Dr. Hamlen has not done any testing to determine whether the plastic bottle cap is safe to ingest.[75]

71. Dr. Hamlen has not done any calculations to determine the rate of error associated with his "bottle cap theory."[76]

72. Dr. Hamlen also referenced in his report and discussed in his deposition an "Epson printer cartridge" concept which he described as a packaging solution.[77]

73. According to Dr. Hamlen, he included a citation to an Epson printer cartridge in his report simply to show that there is what he considered to be "packaging which is basically child-proof" and which he thought could be employed.[78]

---

[71] App. 0108-0109 (Ex. D, Hamlen Depo, p. 172, lns. 24-25, p. 173, lns. 1-4).
[72] App. 0109 (Ex. D, Hamlen Depo, p. 173, lns. 5-11).
[73] App. 0109 (Ex. D, Hamlen Depo, p. 173, lns. 15-18).
[74] App. 0109 (Ex. D, Hamlen Depo, p. 173, lns. 19-25).
[75] App. 0110 (Ex. D, Hamlen Depo, p. 174, lns. 19-25).
[76] App. 0111 (Ex. D, Hamlen Depo, p. 175, lns. 16-18).
[77] App. 0104-0105 (Ex. D, Hamlen Depo, p. 165; lns. 22-25; p. 166; lns. 1-4).
[78] App. 0104-0105 (Ex. D, *Id.*).

74. Dr. Hamlen acknowledged that he did not perform any testing nor did he have any third party perform testing to determine whether a young child could open the Epson packaging. He also conceded that he was not an expert in the field of child resistant packaging.[79]

**J. No Competent Evidence of Plaintiffs' Damages.**

75. Trip King has not sought treatment for his injuries since March 23, 2004.[80]

76. Trip's doctor, Dr. James Miller, noted in the March 23, 2004 letter that he was "pleased with [Trip's] progress" and that it is "*unlikely* that he will have problems in the future."[81]

77. Plaintiffs allege that Trip has an increased risk of cancer, but Plaintiffs' expert and Trip's treating physician acknowledge that he could not testify that Trip has a greater than 50 percent chance of developing esophageal cancer.[82]

78. Dr. Miller, who is admittedly not an oncologist, acknowledged that he could not state to any degree of medical certainty that Trip will develop any future disease.[83]

79. Plaintiffs allege that Trip will require future dilatations to his esophagus, but Dr. Miller acknowledged that future dilatations will only be necessary "only if he starts having trouble swallowing."[84]

80. Plaintiffs allege that Trip will require four or more endoscopies in the future to monitor for potential malignancy, but Dr. Miller acknowledged that he had no idea what a medical endoscopist charges.[85]

---

[79] App. 0105 (Ex. D, Hamlen Depo. p. 166; lns. 5 – 21).
[80] App. 0118-0119 (Ex. G, Miller Depo, p. 48, lns. 21-25, p. 49, lns. 1-5).
[81] App. 0119-0120 (Ex. G, Miller Depo. p. 49, lns. 18-25, 50, lns. 1-16).
[82] App. 0122 (Ex. G, Miller Depo, p. 66, lns. 5-11).
[83] App. 0117, 0122 (Ex. G, Miller Depo, p. 18, lns. 7-8, p. 66, lns. 12-16).
[84] App. 0121 (Ex. G, Miller Depo. p. 56, lns. 14-21).
[85] App. 0123 (Ex. G, Miller Depo. p. 68, lns. 4-9).

81. Plaintiffs allege that Trip has a 1000-fold increased risk of esophageal cancer, but Dr. Miller acknowledged that figure was based upon and 1952 study regarding caustic burns from lye ingestions and Dr. Miller could not speak to whether the risk would be less from a battery ingestion or state what the rate of error was for the 1952 study.[86]

82. Dr. Miller was not aware of anyone developing esophageal cancer from battery ingestion.[87]

83. Plaintiffs seek mental anguish damages for Trip's "fear of future disease," but Plaintiffs stipulated that Trip has no knowledge that he has an alleged increased risk of cancer.[88]

84. Mr. and Mrs. King admit that no one has told them that Trip will not be able to earn a normal living when he gets older because of his injuries.[89]

85. Mr. King admits that Trip does not have any mental anguish over his injuries.[90]

86. Contrary to Plaintiffs' allegations regarding exemplary damages, Plaintiffs' purported risk assessment expert, Mr. Heckmann, acknowledged that Energizer has done "responsible things" and is "concerned about safety."[91]

## III. ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is appropriate where the record discloses "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The purpose of summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper if the pleadings,

---

[86] App. 0124-0125, 0127 (Ex. G, Miller Depo, p. 83, lns. 5-10, p. 85, lns. 1-8, p. 99, lns. 17-21).
[87] App. 0126 (Ex. G, Miller Depo, p. 89, lns. 9-13).
[88] App. 0028-0029 (Ex. A, M. King Depo, p. 162, lns. 2-25, p. 163, lns. 1-8).
[89] App. 0025 (Ex. A, M. King Depo, p. 150, lns. 18-23); App. 0047 (Ex. B, D. King Depo, p. 114, lns. 22-25).
[90] App. 0026 (Ex. A, M. King Depo, p. 151, lns. 7-12).
[91] App. 0085-0086 (Ex. C, Heckmann Depo, p. 177, lns. 21-25, p. 178, lns. 1-17).

discovery record and affidavits show there are no genuine issues about any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1982). The moving party bears the initial burden of pointing out those portions of the pleadings and discovery that demonstrate the absence of a genuine issue of material fact, but is not required to negate the elements of the non-moving party's case. *Id.* at 325.

**B.      Plaintiffs Cannot Identify the Product at Issue in this Lawsuit.**

A fundamental principle of product liability law is that the plaintiff must prove the defendant supplied the product which caused the injury. *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989); *Rodrigues v. General Elec. Corp.*, 204 F.Supp.2d 975, 976 (E.D. Tex. 2001). This includes Plaintiffs' negligence claims. *See Rodrigues*, 204 F.Supp.2d at 976 (plaintiff could not establish existence of a duty and breach since he had no evidence the defendant designed, manufactured, marketed or sold the product at issue.). Likewise, Plaintiffs' warranty claims require proof that Energizer was the seller of the product at issue. *See* TEX. BUS. COMM. CODE § 2.313-315 (express warranty and implied warranty claims require actions by a ***seller***).

Mr. King unequivocally identified the product at issue as coming from a two-battery package with a perforated, cardboard backing. (SUF - 6). Mr. King testified to seeing a two-battery package on the floor the children's playroom after his son ingested the battery. (SUF - 7). To bolster this testimony, Mr. King testified that the cardboard backing was perforated, that one battery was hanging loose in the package after his son ingested the other and that he bought this specific packaging at least a couple of times before this incident. (SUF - 8). Mr. King was so ***certain*** that his son obtained the battery at issue from a two battery package that ***nothing*** could change his mind. (SUF - 9).

Mrs. King likewise testified that there was no question in her mind that it was a two-battery package, but she did not recall seeing the package at issue. (SUF- 10 ). Although Mrs.

King testified that the product was an Energizer, such testimony was not based upon her personal knowledge because Mrs. King did not recall seeing the package, did not handle the battery or package at issue, and did not even examine the battery after it was removed from Trip's esophagus. (SUF - 11, 12, 16). Mrs. King's belief that the product was an Energizer is based solely on her belief that Energizer was the only brand her husband purchased for that type of battery. However, Mrs. King further admits that her husband purchased the batteries and is the best person to indentify the battery and the packaging. (SUF - 15, 17). The sum of the testimony of Mr. and Mrs. King is that they unequivocally identified a product which simply cannot be an Energizer product because Energizer did not sell the CR2025 battery in a two-battery package in January 2003 or any time prior. (SUF - 21). Plaintiffs apparently realized the fatal impact of this on their claims against Energizer after receiving Energizer's expert designations which clearly confirm that Energizer did not sell the two-battery package in 2003, and Plaintiffs confirmed same through an investigation by their counsel. (SUF - 21). In an effort to salvage their claim, Mr. King executed a sham affidavit recanting his previous unequivocal testimony.[92] Plaintiffs have since non-suited their claims relating to the packaging because Mr. King at least now acknowledges that he cannot identify the package at issue. But this does not resolve the inconsistent product identification that is fatal to all of their claims, not merely their packaging claim. Although Mr. King will likely testify that he saw the battery once it was removed from Trip's esophagus and that it was an Energizer, such inconsistent testimony is not competent evidence in light of his unequivocal testimony relating to the packaging.

Plaintiffs' testimony and the uncontroverted summary judgment evidence conclusively establish that the product at issue could not have been Energizer battery. Furthermore, Plaintiffs cannot identify the product through any other competent evidence. As such, Plaintiffs cannot

---

[92] *See* Defendant's Motion to Exclude the Testimony of Michael C. King, Jr. [Filed Document #46]

prove that Energizer manufactured, designed, marketed, sold or supplied the battery ingested by Trip. Therefore, all of Plaintiffs' claims fail a matter of law and Energizer is entitled to summary judgment.

**C. Plaintiffs Cannot Establish that that the Product Reached Plaintiffs Without Substantial Changes in its Condition From the Time it Was Originally Sold.**

In order to prevail on any of their claims, Plaintiffs must prove that the product was defective at the time it left Energizer's control *and* that the product reached Plaintiffs without substantial changes in its condition from the time it was originally sold. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989); *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 582 (Tex. App.-Fort Worth 1987, writ ref'd n.r.e.).

Plaintiffs both admit that they do not have any knowledge as to whether the battery and the packaging was altered or changed from the time it left the manufacturer to the time Trip ingested the battery. (SUF - 18-19). Furthermore, Mr. King admits he discarded the battery and its packaging, so the product at issue cannot be examined or tested by experts to determine whether it reached Plaintiffs without substantial changes in its condition from the time it was originally sold. (SUF - 4-5). Without evidence on this element, Plaintiffs claims fail and Energizer is entitled to summary judgment as a matter of law.

**D. Plaintiffs Cannot Establish Causation.**

Causation is an essential element of each of Plaintiffs' claims.[93] In order to recover under a product defect theory, a plaintiff must prove by a preponderance of the evidence that the defect was the producing cause of the injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a). Plaintiffs' negligence and breach of warranty claims require a showing of proximate cause. *See*

---

[93] *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995) (strict product liability); *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex.1999) (breach of warranty); *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex.1993) (negligence).

*Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999); *Rudes v. Gottschalk*, 324 S.W.2d 201, 207 (Tex. 1959); *see also Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551, 553-54 (N.D. Tex. 2006).

Although Plaintiffs dismissed their packaging claim, the circumstances surrounding Trip's ingestion and the essential element of causation cannot be discussed or analyzed without considering the packaging. It simply cannot be ignored that Plaintiffs continue to maintain that Trip obtained the battery at issue from its original packaging. Thus, in order for Plaintiffs to succeed on any claim, they must first prove that 20-month old Trip King was able to open what Mr. King claimed was a difficult-to-open baby bottle piggy bank, remove an unopened two-battery package, open the package, remove a battery and ingest the battery and do all of this in a span of 2-5 minutes while he was left unsupervised. *See, e.g., Scott v. Dorel Juvenile Group, Inc.*, 773 F. Supp. 2d 664 (N.D. Tex. 2011) (summary judgment granted in favor of manufacturer of cabinet safety latch on causation where incident was not witnessed and plaintiff did not supply evidence that an 11-month old was capable of opening the cap on the Drano crystals package). Because Trip's ingestion was not witnessed and because the baby bottle piggy bank, battery package and battery were all discarded by Michael C. King, Jr. after the incident, Plaintiffs cannot establish that Trip was capable of opening the piggy bank, removing the battery from its packaging and ingesting it.

Even putting aside the fact that the battery package was discarded and that as matters presently stand Plaintiffs have not identified the specific package containing the alleged Energizer battery and the material out of which said package was made, Plaintiffs failed to provide any expert testimony even with respect to the two battery package identified by Michael C. King, Jr. that would establish that Trip possessed the physical strength and cognitive ability to

(1) open the lid of the piggy bank; (2) retrieve the battery pack; (3) figure out how to extract the battery from its packaging; and (4) ingest it and do all of the foregoing in the space of two to five minutes.

Expert testimony is required to establish causation unless a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. *See Bic Pen Corp. v. Carter*, 09-0039, 2011 WL 2420125, *6 (Tex. 2011). The physical and cognitive ability of a 20-month old to open a piggy bank, remove a package of batteries, open a package of batteries, remove a battery and swallow it in a 2-5 minute time span is not something that is within a layperson's general knowledge and understanding. *See Scott*, 773 F. Supp. 2d 664 (mother's testimony regarding her recollection of child's abilities not sufficient to raise a genuine issue of material fact). Because Plaintiffs can put forward no competent evidence of causation, Energizer is entitled to summary judgment on all of Plaintiffs' claims.

**E.  Plaintiffs Cannot Prove the Essential Elements of their Manufacturing Defect/Negligent Manufacturing Claim.**

Although it is unclear whether Plaintiffs are actually asserting a manufacturing defect or negligent manufacturing claim[94], in order to prevail on either claim, Plaintiffs must prove that the product deviated, in terms of its construction or quality, from the specifications or planned output in a manner that rendered it unreasonably dangerous. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997); *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 377-78 (Tex. 1984). Since Plaintiffs discarded the battery and its original packaging, there is no evidence to examine

---

[94]   In Plaintiffs' Amended Petition, Plaintiffs use the term negligent manufacturing, but do not plead the elements of a manufacturing defect claim or negligent manufacturing claim or plead facts to support such a claim. [Filed Document #43] Nevertheless, in an abundance of caution, Energizer moves for summary judgment on this claim as if it has been properly pled by Plaintiffs.

to determine whether the product deviated from its manufacturing specifications. Furthermore, Plaintiffs have presented no evidence, through expert testimony or otherwise, that the battery deviated from the manufacturing specifications. As such, Energizer is entitled to summary judgment on Plaintiffs' manufacturing defect and negligent manufacturing claims.

> **F.      Plaintiffs Cannot Prove the Essential Elements of their Marketing Defect or Negligent Failure to Warn Claims.**

As an initial and dispositive matter, Plaintiffs cannot prove the essential elements of their marketing defect or negligent failure to warn claims because Plaintiffs have not identified the warning at issue. As discussed above, Plaintiffs have amended their complaint to dismiss any and all claims relating to the packaging.[95] However, Plaintiffs did not dismiss their warning claims. Yet, the identification of the battery packaging is essential to Plaintiffs' marketing defect claims because the warning is located on the packaging. (SUF - 28). It is axiomatic that if a package cannot be identified by Plaintiffs, the warning located on the package cannot be identified either. It also follows as a matter of logic that if Plaintiffs cannot even recall what the packaging looked like, they cannot credibly claim to recall the form and content of the warning on the package. Because Plaintiffs cannot identify the warning accompanying the product at issue in this lawsuit, they necessarily cannot establish that any such warning was defective or that such defect caused Trip's injuries.

Assuming, *arguendo*, that Plaintiffs could identify the Energizer package and accompanying warning, Plaintiffs claims for marketing defect and negligent failure to warn still fail as a matter of law because (1) Plaintiffs ignored the warning on the package, which negates the causal link between the alleged inadequate warning and Trip's injury, (2) Plaintiffs cannot

---

[95]    *See generally*, Plaintiffs' Amended Petition. [Filed Document #43].

establish that the warning was inadequate, and (3) Energizer had no duty to warn Plaintiffs of risks that were common knowledge and open and obvious.

In order to prevail on their marketing defect or negligent failure to warn claims, Plaintiffs must prove (1) a risk of harm inherent in the product or which may arise from the intended or reasonably intended use of the product; (2) the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed; (3) the product contains a marketing defect; (4) the absence of a warning renders the product unreasonably dangerous to the ultimate user of the product; and (5) the failure to warn must constitute a causative nexus in the product user's injury. *Wright v. Ford Motor Co.*, 508 F.3d 263, 274-75 (5th Cir. 2007).

First and foremost, Energizer is entitled to summary judgment because Plaintiffs ignored the warning on the package.[96] Under Texas law, failure to read the provided warning negates the causal link between the allegedly inadequate warning and the injury. *Scott*, 773 F. Supp. 2d 664; *Foltz*, 2009 WL 2596598 at *3; *Gillespie v. Century Products Co.*, 936 S.W.2d 50, 53 (Tex. App.-San Antonio 1996, no writ).

Here, it is undisputed that neither Mr. nor Mrs. King read the warnings on the battery package. (SUF - 25). Mr. King, the person who purchased and stored the battery, further testified that even if the warning had been bigger and on the front of the packaging and he had read it, he would not have done anything differently. (SUF - 27). It is further undisputed that if Plaintiffs had followed the warning on the package and actually kept the package out of Trip's

---

[96] Under Texas law, there is a presumption that an adequate warning would have been followed. *Wright v. Ford Motor Co.*, 508 F.3d 263, 275 (5th Cir. 2007). The presumption, however, disappears if evidence is presented that the warning would not have been followed. *Id.* The burden then shifts back to the plaintiffs to show that the warning would have been followed-otherwise the plaintiffs are subject to summary judgment or directed verdict. *Id.* However, Plaintiffs cannot meet their burden as a matter of law if they ignored the warning provided.

reach, Trip's ingestion would have been prevented. (SUF - 26). Plaintiffs' failure to read the provided warning is absolutely fatal to their claim because it negates the causal link between the allegedly inadequate warning and Trip's injury. *Scott*, 773 F. Supp. 2d 664; *Foltz*, 2009 WL 2596598 at *3; *Gillespie*, 936 S.W.2d at 53. Accordingly, Energizer is entitled to summary judgment as a matter of law on Plaintiffs' claims for marketing defect and negligent failure to warn.

Second, Energizer is further entitled to summary judgment on Plaintiffs' marketing defect and failure to warn claims because even if a duty to warn existed, Plaintiffs have no evidence that the warning at issue was inadequate or that any alleged inadequacy caused the injuries. As discussed above, Plaintiffs' risk assessment expert agrees that if Plaintiffs had simply followed the warning on the package and kept the battery out of the reach of their child, the injury could not have occurred. (SUF - 26). This fact is dispositive because a warning's inadequacy cannot cause an accident if following the warning would have prevented the accident. *Scott*, 773 F. Supp. 2d 664. *Foltz*, 2009 WL 2596598 at *3.

Perhaps even more damaging to Plaintiffs' marketing defect claim is the fact that Plaintiffs' own expert testified that Energizer's warning not only complies with the ANSI and UL standards, but actually exceeds them both. (SUF - 29). Energizer's warning was stronger than the UL and ANSI recommended warnings because Energizer used the signal word "WARNING" instead of "CAUTION." (SUF - 30). Energizer's warning was stronger than the UL recommended warning because Energizer put the statement "Keep away from children" as the first warning statement whereas UL included that statement in the middle of its recommended warning. (SUF - 31). Further, Energizer's warning was better than the UL recommended warning because Energizer included a phone number for doctors to call in the

event of an ingestion. (SUF - 32). Plaintiffs have no evidence that the warning at issue in this lawsuit was inadequate; therefore, Energizer is entitled to summary judgment on Plaintiffs' marketing defect and failure to warn claims.

Last, although Energizer's CR2025 was accompanied by a clear and unambiguous warning that would have prevented Trip's injuries, Energizer is entitled to summary judgment on Plaintiffs' marketing defect and negligent failure to warn claims because Energizer had no duty to warn Plaintiffs in the first place. Under Texas law, a manufacturer does not have a duty to warn of obvious risks. *See Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995); *see also Grinnell*, 951 S.W.2d at 426; *Lozano v. H.D. Indus., Inc.*, 953 S.W.2d 304, 314 (Tex.App.-El Paso 1997, no pet.) ("A party has no duty to warn of obvious risks, since a readily apparent danger serves the same function as a warning."); *Hanus v. Texas Utils. Co.*, 71 S.W.3d 874, 880 (Tex.App.-Fort Worth 2002, no pet.) ("a manufacturer has no duty to warn of obvious risks because a readily apparent danger serves the same function as a warning"); *Roland v. DaimlerChrysler Corp.*, 33 S.W.3d 468, 469 (Tex.App.-Austin 2000, pet. denied) ("In Texas, a manufacturer has no duty to warn of open and obvious dangers."). Neither does a duty arise when a consumer is aware of a hazard, but merely underestimates the degree of danger. *Scott*, 773 F. Supp. 2d 664; *Foltz*, 2009 WL 2596598 at *2.

In *Shears*, the operator of a Caterpillar front-end loader was injured in a collision with another front-end loader. *Shears*, 911 S.W.2d at 381. Shears was seriously injured and he sued Caterpillar for, among other things, design defect for designing the front-end loader with a removable rollover protection system ("ROPS") and marketing defect for failing to warn Shears of the risks associated with operating the loader without the ROPS. *Id.* It was undisputed that the presence of a ROPS would have prevented Shears' injuries. *Id.* Following an adverse jury

verdict, Caterpillar appealed. On appeal, the Court of Appeals reversed and rendered a take-nothing judgment on the grounds that (1) Caterpillar did not have a duty to warn Shears of the open and obvious dangers associated with operating a front-end loader without the ROPS, and (2) the product was not defectively designed because Shears offered no evidence of a safer alternative design. *Id.* at 382-385.

With regard to the failure to warn claim, the Court of Appeals noted that the proper inquiry is whether an average person would recognize that operating an industrial vehicle with open sides and top presents a degree of risk of serious harm to the operator. *Id.* at 383. The Court of Appeals determined as a matter of law that an ordinary person, looking at the open cab of a Caterpillar 920 front-end loader, would understand that nothing stands in the way of an intrusion from the rear or above. *Id.* Importantly, the fact that Shears testified that he was not aware of the risks was not determinative because the determination of whether a risk is open and obvious as a matter of law is an objective determination, not a subjective one. *Id.* at 382.

Similarly, in the present case, Energizer had no duty to warn Plaintiffs because it is common knowledge that (1) batteries should be kept away from children, and (2) that small objects, if ingested by children, can cause serious injury or even death. The Plaintiffs themselves admitted that they were aware that small objects could be ingested by children and such ingestion could cause serious injury and even death. (SUF - 23). Plaintiffs' own risk assessment expert acknowledged that the ordinary consumer – particularly a parent – should know to keep batteries away from children and that small objects such as coin cell batteries can be ingested by children and cause serious injury and death *very quickly.* (SUF - 24). Further, although a consumer might not understand the exact chemical composition of a battery, it is common

knowledge that batteries, if ingested, can cause serious injury separate and apart from a choking hazard.

Because it is common knowledge and open and obvious that the ingestion of a battery by a child poses serious risks, including death, the fact that Plaintiffs might have underestimated the risk or not understood the precise mechanism of injury is irrelevant. *See Foltz*, 2009 WL 2596598 at *2 (granting summary judgment on marketing defect claim when plaintiff testified that he knew there was some danger in holding a gun near its cylinder, but that he did not know the extent of that danger). The risks Plaintiffs allege, including esophageal burns and the increased risk of cancer, are subsumed by the known risk of serious injury or death associated with battery ingestions. Therefore, it would be disingenuous for Plaintiffs to argue that they would have kept the battery away from Trip if they had been aware that the battery could cause serious injury to Trip's esophagus within hours of ingestion or cause cancer when they did not keep the battery away from Trip despite their knowledge that Trip could die from choking on a coin the size of a battery.

Based on the open and obvious risks associated with the ingestion of a battery, Energizer did not have a duty to warn Plaintiffs. As such, Plaintiffs' marketing defect and failure to warn claims fails as a matter of law.

Because Plaintiffs cannot establish the essential elements of their marketing defect and negligent failure to warn claims, Energizer is entitled to summary judgment on same.

### G. Plaintiffs Cannot Prove the Elements for a Design Defect Claim Because They Cannot Show that a Safer Alternative Design Existed.

In order to prevail on their design defect and negligent design claims, Plaintiffs must prove that a safer alternative design existed. Plaintiffs dismissed their packaging claims, so their design defect and negligent design claims can only relate to the design of the battery itself.

Plaintiffs cannot prevail on these claims because Plaintiffs cannot adduce competent evidence of a safer alternative battery design. "Safer alternative design" means a product design other than the one actually used and that in reasonable probability:

> (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
>
> (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a)(1). Plaintiffs have the burden of demonstrating by a preponderance of the evidence that a safer alternative design existed at the time the product left the hands of the manufacturer. *Honda of Am. Mfg., Inc. v. Norman*, 104 S.W.3d 600, 605 (Tex. App.-Hous. [1st Dist.] 2003, pet. denied). If no evidence is offered that a safer design existed, *a product is not unreasonably dangerous as a matter of law. Id.* (emphasis added).

In addition, Plaintiffs are required to show that "the safety benefits from its proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety"—that is, that the alternative design not only would have reduced the risk of harm in the instant case, but also would not, "under other circumstances, impose an equal or greater risk of harm." *Id.* (quoting *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex.1998)). In other words, Plaintiffs must prove that an economically and technologically feasible alternative battery design was available and would have prevented or significantly reduced the risk of Trip's injuries without substantially reducing the utility to the "intended users" of the product—namely, all battery users. *Norman*, 104 S.W.3d at 605. In *Norman*, although the plaintiff's experts proposed three potential design alternatives, the court determined

that the plaintiff failed to prove a safer alternative design existed because the experts were unable to show that the designs were economically and technologically feasible at the time or that the designs would have prevented or significantly reduced the risk of the injury. *Id.*

For example, the court rejected one proposed design because the expert did not state the costs of designing, manufacturing and implementing the design. *Id.* at 607. The court noted that to establish economic feasibility, the plaintiff must introduce proof of the cost of incorporating this technology. *Id.* Importantly, the mere fact that the technology is currently used in the marketplace is not sufficient to establish economic feasibility under Texas law. *Id.* The court further rejected the same proposed design because the expert could not testify that the alternative design would have prevented or significantly reduced the risk of injury. *Id.*

The Fifth Circuit reached a similar conclusion in *Smith v. Louisville Ladder Co.*, 237 F.3d 515, 519-20 (5th Cir. 2001). In *Louisville Ladder Co.*, the court determined that the expert's testimony was insufficient to establish a safer alternative design as a matter of law because the proposed design was "a preliminary concept" not currently in use and "not ready to [be] recommend[ed] to a manufacturer." *Id.* at 519. Furthermore, the expert never evaluated the risk associated with the proposed design, did not conduct a risk-benefit analysis and was unable to opine whether the proposed alternative would have prevented the injury in question. *Id.* Nor did the expert address the burdens of or adverse utility effects of the proposed changes or show that the alternative design would be compatible with the product in its current form. *Id.* at 520.

The design alternatives proposed by Plaintiffs in this case are similarly deficient. Although Plaintiffs' experts propose several "concepts," they are nothing more than ideas. Plaintiffs' experts have not done the analysis and testing required to meet the legal standard of a "safer alternative design."

Plaintiffs' expert, Dr. Hamlen, proposed *one* battery design concept and four packaging design concepts. Plaintiffs' risk assessment expert, Mr. Heckmann, proposed three battery design concepts. However, and as previously stated, because Plaintiffs dismissed their packaging claims, the proposed packaging designs are irrelevant. Even if they were not, Dr. Hamlen's and Mr. Heckmann's concepts are merely just that -- ideas that have not been fully vetted, tested, developed or accepted by the scientific community.

**Hamlen Proposed Concept #1: Plastic or lacquer coating on the battery.**

Dr. Hamlen's only battery design concept involves a plastic or lacquer coating on the battery that is pierced by small pins to conduct electricity. (SUF - 50). However, even Dr. Hamlen admits that he is not 100% sure that this idea would work, that millions of products would be rendered useless, and and that it is "not a very practical solution." (SUF - 50). Dr. Hamlen further acknowledged that he was not aware of the scientific community accepting this concept and furthermore, that he had not calculated the costs associated with making such design changes and that it was not a "preferred solution." (SUF - 51). Dr. Hamlen could not testify with a reasonable degree of scientific certainty that this concept would have worked in the dog collar for which the battery was purchased. (SUF - 52).

**Hamlen Proposed Concept #2: Shrink wrap.**

Dr. Hamlen next proposed that the battery be wrapped in shrink wrap that would be unwrapped before the battery was used. (SUF - 53). He acknowledged that this was a packaging design, and that he had conducted no tests to determine whether or not the shrink wrap was child resistant or whether the shrink wrap, once removed posed a separate choking hazard for a child. (SUF - 53). Dr. Hamlen could offer no insight into the toxicity, if any, of the shrink wrap or whether shrink wrapping a lithium battery might lead to the accumulation of gases that could

cause the battery to explode. (SUF - 54). Dr. Hamlen has not done any tests to determine whether the shrink wrap could stick to the battery and impair the battery's utility. (SUF - 55). Dr. Hamlen did not calculate the costs associated with shrink wrapping batteries. (SUF - 56).

**Hamlen Proposed Concept #3: Removable plastic coating or tape.**

Dr. Hamlen also proposed a concept where a plastic coating or tape is placed on the negative electrode of the battery but removed before use. (SUF - 57). However, Dr. Hamlen acknowledges as he must, that this too is an alternative packaging design, not a battery design. (SUF - 57). Dr. Hamlen is not aware of any manufacturer currently using this coating or tape concept. (SUF - 58). Dr. Hamlen acknowledged that he has not even drafted a final design for this concept. (SUF - 59). Dr. Hamlen has not determined or calculated the cost to manufacture and implement this concept. (SUF - 60). No testing has been done by Dr. Hamlen to determine whether children or the elderly could remove the plastic coating. (SUF - 61). Dr. Hamlen has not even done any testing to determine any additional risk associated with children removing the plastic coating and choking on it. (SUF - 62). Dr. Hamlen has not done testing to determine the rate of error for this concept. (SUF - 63).

**Hamlen Proposed Concept #4: Bottle cap theory.**

Dr. Hamlen also proposed a "bottle cap theory" where he proposed placing each CR2025 battery inside a plastic cap before packaging the battery. (SUF - 64). Dr. Hamlen acknowledges that he is not aware of any manufacturers of CR2025 batteries using this design in 2003 or currently. (SUF - 64). The "bottle cap theory" has never even been tested by Dr. Hamlen to see if a child could not, in fact, remove the battery from the cap. (SUF - 65). Dr. Hamlen acknowledges that he "cannot legally testify" whether or not 20-month old Trip could remove the battery from the plastic cap. (SUF - 66). The "bottle cap theory" has never been submitted

to any third party by Dr. Hamlen to see if it is an acceptable alternative design. (SUF - 67). Dr. Hamlen has not done any tests on his "bottle cap theory" to determine the potential choking hazard associated with the bottle cap. (SUF - 68). Dr. Hamlen has not determined the cost of manufacturing the plastic cap and placing it on the battery. (SUF - 69). Dr. Hamlen has not done any testing to determine whether the plastic bottle cap is safe to ingest. (SUF - 70). Dr. Hamlen has not done any calculations to determine the rate of error associated with his "bottle cap theory." (SUF - 71). Interestingly, Plaintiffs' own risk assessment expert, Thomas Heckmann, eviscerated Dr. Hamlen's bottle cap theory. Specifically, Mr. Heckmann opined that Dr. Hamlen's bottle cap theory was not a "good design" because the cap would constitute yet another choking hazard. (SUF - 49).

**Hamlen Proposed Concept #5: Epson printer cartridge concept.**

Dr. Hamlen also referenced in his report and discussed in his deposition an "Epson printer cartridge" concept which he described as a packaging solution. (SUF - 72). According to Dr. Hamlen, he included a citation to an Epson printer cartridge in his report simply to show that there is what he considered to be "packaging which is basically child-proof" and which he thought could be employed. (SUF - 73). Dr. Hamlen acknowledged that he did not perform any testing nor did he have any third party perform testing to determine whether a young child could open the Epson packaging and also conceded that he was not an expert in the field of child-resistant packaging. (SUF - 74). Again, this is simply another "packaging concept" and an untested one at that, from a witness who admits that he is not even a child-resistant packaging expert. It bears noting that Plaintiffs have already dropped their packaging claims in the aftermath of their disclosure that Mr. King was apparently unable to identify the packaging containing the battery at issue in this case.

Mr. Heckmann, Plaintiffs' purported risk assessment expert, also proposed some alternative design concepts of his own, but he has never published an article or journal regarding children's ingestion of button batteries, designed a coin cell battery, or been involved in the manufacturing process of a lithium coin cell battery. (SUF - 37). As such, his concepts should not even be considered. Regardless, he admits that his ideas for a safer design are also merely concepts which have not been developed or placed into production. (SUF - 36). Mr. Heckmann acknowledged that while Plaintiff's counsel may have thought that he would come up with a "slam dunk solution" that would "solve this problem of how do you make this that is not hazardous" ---- that he did not think there was a slam dunk solution and while there may be things that can be done, ***whether those things are practical has to be determined***. (SUF - 38).

**Heckmann Proposed Concept #1: Plastic insulation.**

Mr. Heckmann suggested using plastic insulation over all or part of one side of the cell to prevent an electrical current from forming. Yet, he admitted it was "entirely a concept at this point" and that he could not testify within a reasonable degree of scientific probability that such a concept would work in its application. (SUF - 39). Mr. Heckmann even acknowledged that such a solution did not consider the utility of the product and that he had not even tested the concept yet. (SUF - 40). Mr. Heckman did not do a risk assessment for this concept, did not calculate a rate of error for this concept, and this concept has not been peer reviewed. (SUF - 41).

**Heckmann Proposed Concept #2: Permanent nonconductive ring.**

Mr. Heckmann also advanced the idea of a nonconductive ring permanently applied to the outer edge of the negative face of the battery. But, again, Mr. Heckmann acknowledged that he had not determined whether such a concept would work. (SUF - 42). Mr. Heckmann also acknowledged that he did not know whether such a concept would have prevented the battery

from perforating Trip's esophagus and that the concept had not been fully reviewed and realized, much less developed and that it was not in use by any other brand of batteries. (SUF - 43). According to Mr. Heckmann, the nonconductive ring is not even known yet in the scientific community, much less accepted. (SUF - 44). Finally, Mr. Heckmann could not speak to the issue of how much his proposed nonconductive ring might add to the cost of the battery product. (SUF - 45).

**Heckmann Proposed Concept #3: Replace with 16mm battery.**

Mr. Heckmann also proposed replacement of the twenty millimeter battery with a sixteen millimeter battery. However, he acknowledged that this idea was somewhat absurd because applications requiring a twenty millimeter battery would have to be redesigned and that there are millions of products requiring a twenty millimeter battery that would be rendered useless without a fitting to allow for a sixteen millimeter battery. (SUF - 46-47). Not surprisingly, he could not speak to the issue of cost to the consumer of such a concept. (SUF - 48).

Here, just as in *Norman* and *Louisville Ladder Co.*, Plaintiffs' experts did not (1) evaluate the risk associated with their proposed designs, (2) conduct risk-benefit analyses, (3) introduce proof of the cost of incorporating their designs, (3) address the burdens of or adverse utility effects of the proposed designs or (4) show that the designs would be compatible with the product in its current form. *See Norman*, 104 S.W.3d at 605; *Louisville Ladder Co.*, 237 F.3d at 519-20. Furthermore, Plaintiffs' experts were unable to testify with any degree of scientific certainty that their proposed designs would have prevented or significantly reduced the risk of Trip's injury.

In short, none of Plaintiffs' experts have done the analysis required to determine whether the concepts proposed by them are legally sufficient "safer alternative designs." In Mr.

Heckmann's own words, "[m]aybe they're not practical, maybe they are, but that has to be determined." (SUF - 36-38). Such hypothesizing, without feasibility testing, cost analysis, and considerations of utility, amounts to no evidence of a safer alternative design under Texas law. Because Plaintiffs have no evidence of a safer alternative design, Plaintiffs design defect and negligent design claims fail as a matter of law and Energizer is entitled to summary judgment.

### H. Plaintiffs Cannot Prove the Elements for a Design Defect Claim Because they Cannot Show that the Product at Issue was Unreasonably Dangerous.

In order to prevail on their strict product liability claims, negligence claims and breach of implied warranty claim, Plaintiffs must prove that a product defect rendered it unreasonably dangerous. *See Timpte Indus. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009).[97] To make this determination, Texas courts apply a risk-utility analysis that requires consideration of the following factors:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use;

(2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5) the expectations of the ordinary consumer.

*Id.* The risk-utility analysis does not operate in a vacuum, but rather in the context of the product's intended use and its intended users. *Id.* at 312; *Shears*, 911 S.W.2d at 383-84. Whether the risk of injury is common knowledge is a question of law, not fact. *Shears*, 911 S.W.2d at 383.

---

[97] Importantly, because of Mr. King's wholesale change in sworn testimony, Plaintiffs dismissed their claims relating to the packaging of the battery. As such, Plaintiffs must prove a defect in the design of the battery itself rendered it unreasonably dangerous.

Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law. *Id.* In *Tempte Indus.*, the court determined the product was not unreasonably dangerous as a matter of law because (1) the risk associated with the product (a ladder on a trailer) was open and obvious, (2) the warning accompanying the product would have prevented the injury if followed, (3) the proposed modifications to the ladder would impair the utility of the product, and (4) any risk of injury from the product stemmed from the risk that a user will ignore the written warnings and the open and obvious dangers. *Timpte Indus.*, 286 S.W.3d at 313.

Similarly, in the present case, Plaintiffs have no evidence that the product at issue is unreasonably dangerous when viewed in the context of the risk-utility analysis and the summary judgment evidence proves that the product at issue is not unreasonably dangerous as a matter of law.

With regard to the first factor, Plaintiffs' expert testified that many of today's sleek and thin devices require a three-volt battery such as the CR2025 and that the number of CR2025 batteries sold in the United States could probably get into the low billions. (SUF - 33-35). Mr. Heckmann further testified that although there have probably been billions of CR2025 batteries sold, there have been relatively few serious injuries or deaths. (SUF - 33). Additionally, Mr. Heckmann does not believe the CR2025 should be removed from the market. (SUF - 34). These undisputed facts establish that the utility of the product to the user and to the public as a whole outweighs the gravity and likelihood of injury from its use and Plaintiffs have no evidence to suggest otherwise.

With regard to the second and third factors, Plaintiffs have not (1) identified a substitute product which would meet the same need and not be unsafe or unreasonably expensive, or (2)

identified a method by which Energizer could eliminate the alleged unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs. Plaintiffs' failure to provide evidence of a safer alternative design is discussed in detail in Section III(G), *supra*, and is incorporated herein.

With regard to the fourth and fifth factors, Plaintiffs admit that children can choke on small items and that ingestion of such items can lead to serious injury or death. (SUF - 23). Ordinary consumers – particularly parents – know to keep batteries away from children and that small objects such as coin cell batteries can be ingested by children and cause serious injury and death very quickly. (SUF - 24). Furthermore, any risk of injury to children can be completely avoided if the batteries are kept out of the reach of children as provided for in the warning accompanying the package. (SUF - 26).

When viewed under the risk-utility analysis, the CR2025 battery is not unreasonably dangerous as a matter of law, and Plaintiffs simply do not have competent evidence to establish that the product has a defect that renders it unreasonably dangerous. As such, Energizer is entitled to summary judgment on Plaintiffs' product liability, negligence and implied warranty claims as a matter of law.

I.     **Plaintiffs Cannot Prove the Essential Elements of their Express Warranty Claim.**

In order to prevail on a breach of express warranty claim, Plaintiffs must prove (1) Energizer made an express affirmation of fact or promise relating to the product, (2) the affirmation of fact or promise became a basis of the bargain, (3) Plaintiffs relied upon said affirmation of fact or promise, (4) the product failed to comply with the affirmations of fact or promise, (5) Plaintiffs were injured by such failure of the product to comply with the express warranty; and (6) the failure to comply was the proximate cause of Plaintiffs' injury. TEX. BUS.

& COMM. CODE § 2.316; *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex. App. – Ft.

Worth 1987, writ ref'd n.r.e.). Plaintiffs have no evidence to establish any of the elements of a

breach of warranty claim. Furthermore, Plaintiffs admit they did not purchase the product from

Energizer and Energizer did not make any express representations to them. (SUF - 15). As such,

Energizer is entitled to summary judgment as a matter of law on Plaintiffs' breach of express

warranty claim.

> **J.       Plaintiffs Cannot Prove the Essential Elements of their Implied Warranty of
> Merchantability Claim.**

Plaintiffs' claim for breach of the implied warranty of merchantability fails because the

product was not defective and Plaintiffs have no evidence to establish the essential elements of

their claim. A plaintiff asserting a breach of implied warranty of merchantability claim must

prove: 1) that the product was defective as unfit for its purpose because of a lack of what was

required for adequacy; 2) that the alleged defect existed when the product left the defendant's

possession; and 3) that the alleged defect proximately caused the injuries for which plaintiff

seeks damages. *Scott*, 773 F. Supp. 2d 664.

Strict liability for a manufacturing defect and breach of an implied warranty of

merchantability are two separate causes of action, however, the existence or non-existence of a

manufacturing defect for purposes of products liability often resolves whether a product was

defective for purposes of an alleged breach of the implied warranty of merchantability. *Elliott v.*

*Kraft Foods N. Am., Inc.*, 118 S.W.3d 50, 56-57 (Tex. App.-Hous. [14th Dist.] 2003, no pet.)

Indeed, where the defect alleged is the same for purposes of both a strict liability claim and a

breach of an implied warranty claim, the defect for both claims can be functionally identical. *Id.*

Also, the proximate causation element of a strict liability claim subsumes within it the concept of

producing cause. *Id.*

Because the defect alleged in Plaintiffs' implied warranty claim is the same as the defect alleged for Plaintiffs' strict product liability claims, Plaintiffs' breach of implied warranty claim fails for the same reasons set forth in Sections III(B)-(H), *supra*. Furthermore, Plaintiffs have no evidence that the product at issue was unfit for its ordinary purpose – to power small electronic devices. For these reasons, Energizer is entitled to summary judgment as a matter of law on Plaintiffs' breach of implied warranty claim.

### K.   Plaintiffs Cannot Recover Damages for "Fear of Future Disease or Condition."

Plaintiffs allege that Trip has a 1000-fold[98] increased risk of developing esophageal cancer, but Plaintiffs' expert and Trip's treating physician, Dr. Miller, acknowledged that figure was based upon caustic burns from lye ingestions and that he could not speak to whether the risk would be less from a battery ingestion. (SUF - 81). Furthermore, Dr. Miller could not state to any degree of medical certainty that Trip will develop any future disease. (SUF - 78).

Even if the 1000-fold increase was supported by medical literature analyzing caustic burns from battery ingestions, which it is not, Plaintiffs cannot recover for "fear of future disease or condition" because Texas law does not permit recovery for same and because Plaintiffs stipulated that Trip King is not aware of his alleged increased risk of cancer. (SUF - 83). It is well settled in Texas law that in order for a plaintiff to recover damages for a disease that may develop in the future, the plaintiff must prove by expert testimony that there is a reasonable medical probability that the disease will appear. *See Pustejovsky v. Rapid-American Corp.*, 35 S.W.3d 643, 652 (Tex. 2000). This means that the plaintiff must demonstrate a greater than

---

[98]   Plaintiffs allege that the Trip has a 1000-fold increase of developing esophageal cancer because of the injuries to his esophagus, but Plaintiff's expert Dr. Miller could not testify with reasonable medical certainty that Trip will develop any future disease. (SUF - 78). Furthermore, Dr. Miller, who admittedly is not an oncologist, relied exclusively on a 1952 study regarding lye ingestions. (SUF - 81). He was unable to testify how the study derived its statistics or what the rate of error was in the study. (*Id.*) Accordingly, Defendant intends to challenge this testimony.

fifty-percent chance of developing the disease. *Id.* Dr. Miller acknowledged that he could not testify that Trip has a greater than fifty-percent chance of developing cancer. (SUF - 77). Therefore, Plaintiffs cannot recover damages for cancer Trip might develop in the future.

To the extent Plaintiffs' claim of "fear of future disease or condition" is a claim for mental anguish damage for the present fear of a future disease, they should still be prohibited from recovery for same under Texas law. In *Temple-Inland* and *Pustejovsky*, the Texas Supreme Court held that an individual who has been exposed to asbestos, but has not developed an asbestos related disease, could not recover mental anguish damages for the reasonable fear of developing mesothelioma or another asbestos related cancer. *See Pustejovsky*, 35 S.W.3d at 650; *Temple-Inland Forest Products v. Carter*, 993 S.W. 2d 88, 91-94 (Tex. 1999). ' Even the existence of a physical injury may not be sufficient for recovery of mental anguish damages when the injury has not produced disease despite a reasonable fear that such disease will develop. *Temple-Inland*, 993 S.W. 2d at 91-94.

The plaintiff in *Temple-Inland* did suffer a physical injury from the inhalation of asbestos fibers, but he did not have asbestosis or any other asbestos related disease. *Id.* The *Temple-Inland* Court explained that while the law generally allows recovery of mental anguish damages in cases where the plaintiff suffered an actual physical injury, allowing recovery for fear of a disease when the plaintiff has no symptoms of that disease results in systematic under-compensation of those who actually contract the disease and a windfall for those who do not. *Id.* at 92. In rejecting the plaintiff's mental anguish claims for fear of future disease, the court also cited three additional policy considerations: the "special difficult[y] for judges and juries in separating valid, important claims from those that are invalid or trivial, a threat of unlimited and unpredictable liability; and the potential for a flood of comparatively unimportant, or trivial, claims." *Id.* at 93.

Although the Texas Supreme Court has not directly applied *Temple-Inland* to non-asbestos cases, it has been applied to cases involving exposure to other potentially harmful substances, including benzene and radiation, by a Texas appellate court and a federal district court. *See Exxon Corp. v. Makofski*, 116 S.W.3d 176 (Tex.App.-Hous. [14th Dist.] 2003, pet. denied); *Norwood v. Raytheon Co.*, 14 F.Supp.2d 659 (W.D. Tex. 2006). In *Makofski*, the plaintiff sought recovery for mental anguish for an increased risk of developing cancer due to his exposure to high levels of benzene. *Makofski*, 116 S.W.3d 188-190. The jury awarded $200,000 for mental anguish, but the appellate court overturned the verdict relating to mental anguish damages for the increased risk of developing a future disease. *Id*. at 190. The facts of *Makofski* were somewhat distinguishable in that the plaintiff did not show any evidence of physical injury from the exposure. *Id*. However, the court plainly stated that Texas law "prohibits recovery of mental anguish damages for an increased risk of developing a disease that is not presently manifest" and did not limit the holding to cases where no physical injury occurred from exposure. *Id*.

In *Norwood*, the plaintiffs, who had allegedly been exposed to high levels of radiation from radar devices, sought to recover damages for future medical monitoring and surveillance services to protect plaintiffs from an increased risk of harm and disease. *Norwood*, 414 F.Supp.2d at 661-62. The plaintiffs allegedly were exposed to radiation, but were not yet affected with an illness or injury caused by such exposure. *Id*. at 661. Although the case involved future medical monitoring and not mental anguish for fear of future disease, the court applied the reasoning of *Temple-Inland* and determined that Texas law would not permit the recovery of future medical monitoring when the disease was not presently manifest. *Id*.

In light of the Texas Supreme Court's opinions in *Temple-Inland* and *Pustejovsky* as applied to non-asbestos cases in *Norwood* and *Makofski*, Plaintiffs should not be permitted to recover damages for "fear of future disease or condition" because although Trip suffered an injury to his esophagus, he has no evidence of a malignancy and esophageal cancer is not otherwise presently manifest.

Assuming, *arguendo*, that Texas law does permit recovery of mental anguish damages for a present fear of a future disease, Plaintiffs claim for fear of future disease still fails because Plaintiffs stipulated that Trip does not know that he has an alleged risk of esophageal cancer. (SUF - 83). Furthermore, Plaintiffs have not retained or designated an expert to testify that Trip will suffer mental anguish when and if he learns that he has an alleged increased risk of cancer. Accordingly, Energizer is entitled to summary judgment on Plaintiffs' claim for damages for "fear of future disease or condition."

### L. Plaintiffs Cannot Recover Damages for "Cost of Medical Monitoring and Prevention in the Future."

As an initial matter, Plaintiffs cannot recover medical expenses incurred prior to Trip's age of majority or emancipation because such claims were previously dismissed with prejudice. Such pre-majority claims belong to Trip's parents and are barred by the statute of limitations. To the extent Plaintiffs seek future expenses for medical monitoring that Trip will incur after he turns eighteen or is otherwise emancipated, Energizer is entitled to summary judgment because Plaintiffs have no evidence of the reasonable and necessary costs for same. (SUF - 80). Even if Plaintiffs had competent evidence of such costs, Plaintiffs should not be able to recover same under Texas law.

Although there are no Texas cases discussing recovery for future medical monitoring in the absence of manifest symptoms of a disease, the U.S. District Court for the Western District

of Texas in *Norwood* made an *Erie* guess that the Texas Supreme Court would not permit recovery for medical monitoring in the absence of present physical injuries. *See Norwood*, 414 F.Supp.2d at 661-62. The *Norwood* court relied heavily upon the *Temple-Inland* decision. In *Temple-Inland*, there was evidence that the plaintiff suffered a physical injury (pleural thickening caused by inhalation of asbestos), but the plaintiff had not developed any symptoms of an asbestos related disease. *Temple-Inland*, 993 S.W. 2d at 80-89. Similarly, although Trip suffered injuries to his esophagus, those injuries were treated and he has not developed any symptoms of esophageal cancer. In fact, Trip has not received treatment for his injuries since March of 2004. (SUF - 75). Following the reasoning of *Temple-Inland* as applied by *Norwood*, absent present manifestation of cancer symptoms (of which Plaintiffs have no evidence), Trip should not be permitted to recover damages for future medical monitoring costs.

**M.    Plaintiffs Have No Evidence to Support Their Claim of Loss of Earning Capacity.**

Plaintiffs seek damages for loss of earning capacity which will be incurred by Trip King in the future,[99] but Plaintiffs have no evidence to support their claim. Trip is currently 10 years old and does not have a job. Plaintiffs have not retained or designated an expert to testify how the injuries to Trip's esophagus will somehow impact his ability to earn a living and Plaintiffs admit that no one has told them that Trip's injuries will impact his ability to earn a living in the future. (SUF - 84). Accordingly, Energizer is entitled to summary judgment on Plaintiffs' claim for loss of earning capacity.

---

[99]    As with medical expenses, any damages for loss of earning capacity prior to Trip King's age of majority or emancipation belong to his parents and those claims were previously dismissed because they are barred by the statute of limitations.


**N.      Plaintiffs Have No Evidence of Future Medical Expenses.**

To the extent Plaintiffs seek medical expenses related to the injuries to esophagus (as opposed to medical monitoring expenses to detect or prevent esophageal cancer), Energizer is entitled to summary judgment on same because Plaintiffs have not provided any evidence that Trip will incur medical expenses after he reaches the age of majority or is otherwise emancipated.  Indeed, Trip has not received medical treatment for his injuries since March of 2004, so there is no reason to believe that he will require treatment in 2020 and beyond.  (SUF - 75).  To recover future medical expenses, Plaintiffs must show the amount of the future expenses and show there is a reasonable probability such expenses will *actually* be incurred in the future.  *Sanmina–SCI Corp. v. Ogburn*, 153 S.W.3d 639, 642 (Tex.App.-Dallas 2004, pet. denied).  Plaintiffs' have not offered any medical expert testimony that to a degree of reasonable medical probability Trip will require medical treatment in 2020 and beyond or what reasonable and necessary expenses he would incur from same.  Although Dr. Miller mentioned the possible need for future dilatations to Trip's esophagus, Dr. Miller does not state that Trip will incur such expenses in reasonable medical probability.  To the contrary, Dr. Miller testified that the dilatations would only be necessary "if [Trip] starts having trouble swallowing."  (SUF - 79).  As such, Energizer is entitled to summary judgment as a matter of law on Plaintiffs' claim for future medical expenses.

**O.      Plaintiffs' Claims for Exemplary Damages Fail as a Matter of Law.**

Plaintiffs seek exemplary damages from Energizer on the alleged basis that Energizer acted with gross negligence and/or malice.  Under Texas law, gross negligence means an act or omission:

A)      which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others;  and

B)   of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11)(A)-(B). "Malice" means "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE § 41.001(17). There is no evidence that Energizer had a specific intent to cause harm to Trip King and Plaintiffs have no evidence that Energizer had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. To the contrary, Plaintiffs' purported risk assessment expert, Mr. Heckmann, testified that Energizer has "done responsible things" and that Energizer is "concerned about safety." (SUF- 86). Plaintiffs have no evidence of gross negligence or malice and the testimony of Plaintiffs' own expert negates their exemplary damages claim. As such, Energizer is entitled to summary judgment on Plaintiffs' claim for exemplary damages.

## IV.   **CONCLUSION**

The summary judgment evidence attached conclusively establishes that Energizer did not sell the product at issue and Plaintiffs cannot identify the product as an Energizer battery. Furthermore, Plaintiffs own testimony negates essential elements of their claims, and Plaintiffs lack competent evidence to support the essential elements of their claims. Accordingly, Energizer is entitled to summary judgment on all of Plaintiffs' claims.

Respectfully submitted,

By: _____
**Jason W. Fatheree**
State Bar No. 24027162
**S. Wesley Butler**
State Bar No. 24045593

**CROUCH & RAMEY, L.L.P.**
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
Tel.  (214) 922-7100
Fax  (214) 922-7101
jfatheree@crouchfirm.com
wbutler@crouchfim.com

**ATTORNEYS FOR DEFENDANT
ENERGIZER HOLDINGS, INC.**


**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing has been served via the means indicated below on counsel of record for Plaintiffs on this the 15th day of August, 2011.

Scott W. Wert
Foster & Sear, LLP
817 Greenview Drive
Grand Prairie, TX  75050
Via Hand Delivery and CMRRR

S. Reed Morgan
Law Offices of S. Reed Morgan, P.C.
413 Eighth Street
Comfort, TX  78013
Via CMRRR

_____
Jason W. Fatheree